CALIFORNIA RURAL LEGAL ASSIST-
ANCE, INC.; American Federation of
Labor and Congress of Industrial Orga-
nizations; International Ladies' Gar-
ment Workers Union; Maria Rita Agui-
lar; and Maria F. Castillo, Plaintiffs–
Appellees,

v.

LEGAL SERVICES CORPORATION;
Terrance J. Wear, President; and Legal
Services Corporation Pacific Regional
Office, Defendants–Appellants.

No. 89–16734.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 1990.

Decided Oct. 26, 1990.

Hugh J. Cadden and Robert G. Levy, Barger & Wolen, San Francisco, Cal., for defendants-appellants.

Stephen P. Berzon, Michael Rubin, Robert C. Bell, Jr., Altshuler, Berzon, Nussbaum, Berzon & Rubin, Robert Rubin, San Francisco Lawyers Committee for Urban Affairs, San Francisco, Cal., Susan Drake, National Immigration Law Center, Los Angeles, Cal., for plaintiffs-appellees.

Before CHOY, FARRIS and THOMPSON, Circuit Judges.

CHOY, Circuit Judge:

Legal Services Corporation (LSC) appeals the district court's grant of summary judgment in favor of California Rural Legal Assistance, Inc. (CRLA) in CRLA's class action to enjoin the enforcement of a regulation promulgated by LSC. 727 F.Supp. 553.[1] The regulation prohibits legal services programs from using funds supplied by LSC to provide legal services to perma-

nent resident aliens who obtain their status under the Immigration Reform and Control Act of 1986 (IRCA), Pub.L. No. 99–603, 100 Stat. 3359 (1986).[2] The question on this appeal is whether the district court correctly concluded that legal services is not a program of "financial assistance" within the meaning of Section 245A(h) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1255a(h)(1)(A)(i). We affirm.

## THE STATUTORY CONTEXT

The Immigration Reform and Control Act of 1986 (IRCA) authorized the granting of legalization to aliens ("amnesty aliens") who had been present in the United States in an unlawful status since January, 1982.[3] Congress included in IRCA a provision entitled "temporary disqualification of newly legalized aliens from receiving certain public welfare assistance," 8 U.S.C. § 1255a(h). That section, which is the provision at issue on this appeal, provided that newly legalized aliens would be ineligible for a period of five years for "any program of financial assistance furnished under Federal law (whether through grant, loan, guarantee, or otherwise) on the basis of financial need, as such programs are identified by the Attorney General ... (but in any event including the program of aid to families with dependent children....)" 8 U.S.C. § 1255a(h)(1)(A)(i).

---

1. Plaintiffs include California Rural Legal Assistance, Inc. (CRLA), the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO), the International Ladies' Garment Workers Union (ILGWU), Maria Rita Aguilar and Maria F. Castillo.

2. The LSC regulation provides in relevant part:
   "(a) Subject to all other eligibility requirements of the Act, an alien who is present in the United States and who is within one of the following categories shall be eligible for legal services:
   (1) ... except that an alien who has adjusted his status to that of temporary resident alien under the provisions of section 245A of INA (section 201 of IRCA, 100 Stat. 3394, 8 U.S.C. 1255a) shall not be eligible for legal assistance pursuant to the provisions of section 245A(h) of INA (8 U.S.C. 1255a(h)) for a period of five years, which commences on the date the alien is granted temporary resident alien status as deter-

mined by INS, whether or not such alien acquires the status of permanent resident alien during the five-year period, unless the alien can qualify independently under another exception to the general restrictions...."
   54 Fed.Reg. 18109, 18111 (April 27, 1989) (to be codified at 45 CFR § 1626).

3. See 8 U.S.C. § 1255a(a). IRCA required aliens seeking legalization to apply to the Attorney General by May 4, 1988 to adjust their status. Aliens who satisfied the statutory eligibility criteria could then pass through two stages on the way to becoming United States citizens. First, after establishing eligibility for legalization, they would become "temporary resident aliens." 8 U.S.C. § 1255a(a). Then, after an 18-month waiting period during which they were required to establish certain basic citizenship skills, they would become "permanent resident aliens," who could then become eligible for naturalization and citizenship. 8 U.S.C. § 1255a(b).

## PROCEEDINGS BELOW

On October 19, 1988 defendant LSC proposed the regulation that is at issue on this appeal. The proposed regulation banned the use of LSC funds to provide legal services to amnesty aliens on the basis of section 1255a(h), even though the Attorney General had not yet identified legal services as a "program of financial assistance." LSC issued its regulation on April 27, 1989, with a proposed effective date of May 31, 1989.

CRLA filed this action on May 26, 1989 and applied for a temporary restraining order to enjoin implementation of the regulation. CRLA argued that the regulation was contrary to law, because legal services was not a program of financial assistance within the plain meaning of the INA. It further argued that LSC lacked authority to issue its regulation in the absence of a designation of legal services as a program of financial assistance by the Attorney General.

On May 26, 1989 the district court granted CRLA's application for provisional class certification and a temporary restraining order.[4] On June 8, 1989, a preliminary injunction hearing was held. Defendants stipulated to keeping the temporary injunction in effect until the court issued a final decision on the merits.

On July 12, 1989, the Attorney General issued a final rule which designated legal services as a program of financial assistance covered by the five year ban in Section 245A(h)(1)(A)(i). 54 Fed.Reg. 29434, 29436 (July 12, 1989).[5] The final rule adopted by the Attorney General interpreted "financial assistance" as follows:

> The Department of Justice believes that it is irrelevant that legal services are not financial assistance. The statute provides that legalized aliens are not eligible

for certain kinds of programs, namely, those involving "financial assistance furnished on the basis of Federal law * * * on the basis of financial need." (sic). Legal services provided to individuals by the Legal Services Corporation do constitute benefits from such a program.

> ... It is the Department's view that the focus of the inquiry as to whether a benefit comes from a "program of financial assistance furnished under federal law * * * on the basis of financial need" should not be ... the form the benefit to the ultimate recipient takes, whether a cash grant (or loan, loan guarantee, etc.) or goods or services, but rather that the benefit is financed with Federal funds that are targeted to those in financial need.

54 Fed.Reg. at 29436.

On the basis of the Attorney General's final rule, LSC moved to vacate the stipulated injunction against LSC's regulation. On August 17, 1989, the district court denied LSC's motion. The parties then filed cross-motions for summary judgment.

On November 30, 1989, the district court granted CRLA's motions for class certification and summary judgment, and permanently enjoined LSC from implementing LSC's five-year ban on providing legal services to Amnesty aliens. The district court concluded that "the statutory text demonstrates that Congress did not intend the term 'financial assistance' to include service programs such as legal services" and that the Attorney General's designation was thus contrary to the clear intent of Congress. The district court also held that plaintiffs AFL–CIO and ILGWU had standing.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Kruso v. Int'l Tel. & Tel.*

---

**4.** The district court certified a class consisting of two subclasses: 1) legal services programs, of which CRLA is the named representative; and 2) Section 245A legalized aliens, of which the named individual plaintiffs and the plaintiff unions are the named representatives.

**5.** CRLA points out that the Attorney General's final regulation is contrary to the interpretation

forwarded in a proposed regulation by the prior Attorney General. We decline to take cognizance of the proposed regulation however, because "a proposed regulation does not represent an agency's considered interpretation of its statute...." *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 845, 106 S.Ct. 3245, 3253, 92 L.Ed.2d 675 (1986).

*Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989). The interpretation of a statute is a question of law reviewed de novo. *Saratoga Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 879 F.2d 689, 691 (9th Cir.1989). The district court's grant of permanent injunctive relief is reviewed for an application of erroneous legal principles. *Guadamuz v. Bowen*, 859 F.2d 762, 766 (9th Cir.1988) (citing *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 465 (9th Cir.1985)).

The issue of the unions' standing is subject to de novo review. *American Postal Workers Union v. United States Postal Serv.*, 861 F.2d 211, 213 (9th Cir.1988).

A district court's decision to grant or deny class certification is reviewed for abuse of discretion. *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 479 (9th Cir. 1983).

## STANDING

■ LSC argues that union plaintiffs AFL–CIO and ILGWU have failed to demonstrate that they or any of their members will suffer harm from the legal services ban and that the two unions thus lack standing to challenge the regulation. This contention is without merit.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington*

*State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). *See also International Union, UAW v. Brock*, 477 U.S. 274, 288–90, 106 S.Ct. 2523, 2531–33, 91 L.Ed.2d 228 (1986).

LSC argues that the unions fail the test for associational standing for two reasons. First, it argues that the interest the unions seek to protect is not germane to their purpose. We disagree. The Supreme Court, in considering the question of a union's standing to challenge an agency's regulation depriving its members of benefits under the Trade Act of 1974, looked to that union's constitution to determine that the interests the union sought to protect were germane to that organization's purpose. The Court noted that the union had an interest in obtaining benefits for its workers and had, as one of its stated goals, working for such legislation on a national scale. *International Union, UAW*, 477 U.S. at 286, 106 S.Ct. at 2430. In the present case, the unions have set forth institutional goals of protecting a broad range of rights for workers. These purposes are reflected in the unions' constitutions, and are sufficient to meet the requirements for associational standing.[6]

Second, LSC argues that the unions have not shown that any of their members have standing to sue in their own right, since plaintiffs have not shown that any union member has actually sought or been denied access to legal services. However, CRLA alleged in its complaint that "[m]any members of the AFL–CIO are § 245A legal residents who utilize LSC funded legal services programs." With respect to the ILGWU, CRLA alleged that many of its members are § 245A legal residents who "suffer from the full range of legal problems affecting the working poor and are financially eligible for legal services." These members would clearly be adversely affect-

---

**6.** For example, the constitution of the ILGWU states the following institutional objectives: "... to advance the economic, social, and political interests of the I.L.G.W.U., its subordinate organizations, their members and their dependents; ... to seek the improvement of general economic, social and educational conditions ...; to

engage in charitable, cultural, social, legislative, educational, civic, welfare, community, political, and other activities which directly or indirectly advance such objectives; and ... to provide financial support and assistance and all other lawful means to carry out the objectives of this Section ..."

ed if the LSC regulation is enforced. We find these facts, which LSC failed to rebut below, sufficient to establish the unions' standing to sue.

## CLASS CERTIFICATION

The district court certified a class consisting of two subclasses: 1) legal services programs, of which CRLA is the named representative; and 2) section 245A legalized aliens, of which the named individual plaintiffs and the plaintiff unions are the named representatives.

### (1) Union Plaintiffs

█ LSC argues that the unions are not members of the class they seek to represent and thus fail the commonality requirement of Fed.R.Civ.P. 23(a)(2).[7] They argue that the unions fail the commonality requirement because they "are neither legal services programs or section 245A legalized aliens." This contention is without merit, since, in their associational capacity, the unions are acting on behalf of section 245A legalized aliens.

### (2) CRLA

LSC also argues that CRLA is not a member of the class it seeks to represent because it does not suffer the same injury as that alleged by the class of legal services programs. LSC argues that CRLA, unlike other legal services programs, has non–LSC funds available to it.

█ This distinction is unavailing. Fed. R.Civ.P. 23, which governs class actions, does not require the named plaintiffs to be identically situated with all other class members. It is enough if their situations share a "common issue of law or fact"

(*Blackie v. Barrack*, 524 F.2d 891, 904 (9th Cir.1975)), and are "sufficiently parallel to insure a vigorous and full presentation of all claims for relief." *Sullivan v. Chase Inv. Serv. of Boston*, 79 F.R.D. 246, 257 (N.D.Cal.1978). Clearly, CRLA shares a "common issue of law or fact" with other legal services programs. The fact that it may receive non–LSC funds does not diminish CRLA's ability to vigorously represent the interests of other LSC recipients.

## 8 U.S.C. § 1255a(h)

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). The critical phrase in the statute before us is the term "financial assistance."

LSC contends that the term "financial assistance" refers to all programs of assistance furnished under federal law (on the basis of financial need), regardless of whether the assistance takes the form of monetary benefits or services. In contrast, CRLA argues that programs of "financial assistance" refer only to programs in which the government provides pecuniary benefits to needy individuals.

█ We agree with CRLA that the plain meaning of "financial assistance" refers to direct pecuniary or monetary assistance, and not to assistance in the form of services.[8] Under LSC's construction, the statutory reference to programs of "financial" assistance would be superfluous, because every program of assistance under federal law is federally funded, regardless of what type of benefits are ultimately

---

7. Rule 23(a) states:
   Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

8. LSC argues that the Attorney General's interpretation is due deference. However, because we find the intent of Congress to be clear, no deference is due. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984) (courts are "the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

provided to the eligible recipient. LSC reads section 1255a(h)(1)(A)(i) as if it imposed a ban on "programs of assistance" rather than, as the statute more specifically provides, on programs of "financial assistance." LSC's construction violates the settled canon of statutory construction that the courts are "required, 'if possible, to give effect to every word Congress used.'" *In Re Co Petro Marketing Group, Inc.*, 680 F.2d 566, 570 (9th Cir.1982) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979)). Giving weight to all of the words in section 1255a(h)(1)(A)(i), we think Congress intended to limit the five-year ban only to those programs that provide "financial assistance" to eligible individuals—which legal services does not.

Congress's intent to use the term "financial assistance" in its literal sense is underscored by the text of section 1255a(h), in which Congress repeatedly distinguished between programs of *financial* assistance and programs of other types of assistance. This distinction supports CRLA's plain meaning construction, because it confirms that Congress used terms *other* than "financial assistance" when it intended to describe federal assistance programs that were not limited to the provision of pecuniary benefits.

Section 1255a(h) provides, in relevant part:

> (A) ... [T]he alien is not eligible for—
> (i) any program of financial assistance furnished under Federal law ... (but in any event including the program of aid to families with dependent children ...),
> (ii) medical assistance under ... Title XIX of the Social Security Act ..., and
> (iii) assistance under the Food Stamp Act....

Section 1255a(h) thus establishes three categories of benefit programs that are subject to the five-year statutory ban: (1) "financial assistance," including aid to families with dependent children ("AFDC"); (2) "medical assistance;" and (3) food stamp assistance. Section 1255a(h) distinguishes between programs of financial assistance that provide pecuniary aid, such as AFDC, and service programs, such as medical assistance and food stamp assistance, that provide other forms of benefits.

LSC argues that the term "financial assistance" in subsection (i) constitutes a general category covering all assistance, and that "medical assistance" in subsection (ii) and assistance under the Food Stamp Act in subsection (iii) are "specific" programs, or subcategories, of financial assistance. It argues that "(i)f any categorization exists, it consists of programs to be identified by the Attorney General and those already specifically identified by Congress."

We disagree. LSC's analysis fails to account for the specific reference to AFDC in subsection (i) programs of financial assistance. If the categorization consisted of programs to be identified by the Attorney General ("financial assistance" programs) and those already specifically identified by Congress, then AFDC would be listed in its own separate subcategory, as are the medical assistance and food stamp assistance programs. Thus, the statute would list the general category of financial assistance programs to be identified by the Attorney General in subsection (i). It would then have listed AFDC in a separate subsection as it did for the other specifically designated programs of medical assistance and food stamp assistance.

Alternatively, if financial assistance were simply the general category, covering specific programs of medical assistance and food stamps, Congress would have drafted subsection (i) to state, "but in any event including AFDC, medical assistance and food stamps." No separate subsections (ii) and (iii) would have been required. However, the statute is not so drafted. Rather, Congress listed AFDC as the only specifically designated program falling within the category of "financial assistance." This suggests that Congress considered AFDC, but not medical or food stamp assistance, to be a "program of financial assistance." AFDC, as opposed to medical or food stamp assistance, is a program which provides cash payments directly to eligible individuals. In its argument LSC fails to address the listing of a specific program,

AFDC, in what it contends is simply a general category of programs to be designated by the Attorney General. We find LSC's explanation of the structure of the disqualification provision (§ 1255a(h)) untenable in light of the inclusion of AFDC in subsection (i).

We find further evidence of the limited nature of the term "financial assistance," in the fact that when Congress referred to the broad range of federal assistance programs, including both financial and other programs, it used the general term "public welfare assistance," 8 U.S.C. § 1255a(h), or "assistance," *id.* at § 1255a(h)(2)(B), and not the limited term "financial assistance."

The way in which Congress has distinguished among programs of "financial assistance," "assistance," and "medical assistance" in section 1255a(h) indicates that "financial assistance" means *financial* assistance and not just "assistance."

LSC relies principally on INA section 303(d)(6), 8 U.S.C. § 1161(d)(6) to support its interpretation of section 1255a(h).[9] That section provides that the five-year prohibition on certain programs of financial assistance does not preclude the provision of legal services to Replenishment Agricultural Workers.[10] However, we find that section 1161 simply does not purport to express Congress' intent with regard to the proper construction of section

1255a(h)(1)(A)(i) itself. *Compare Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 1401, 99 L.Ed.2d 645 (1988) (when Congress states that a particular statutory provision "shall not be construed" to preclude certain activity, "[t]hat language need not be read as an exception" indicating that absent the proviso, the activity would otherwise be precluded). We decline to draw a negative inference from section 303(d)(6), which occurs in another section of the statute and which refers to a separate category of aliens, to defeat what we think is the plain meaning of section 245A(h).[11]

Finally, we note that the the Attorney General's interpretation of financial assistance as depriving amnesty aliens of legal services belies one of the central purposes underlying the legalization decision.[12] When Congress passed IRCA, it recognized that undocumented aliens had historically been victims of exploitation and deprivation of legal rights. One of the primary reasons for the passage of IRCA was that "[a] subclass of people who cannot exercise their rights has been created." Cong.Rec. H10598 (daily ed. Oct. 15, 1986) (remarks of Rep. McKinney). The House Judiciary Committee expressed this concern in a report stating:

**9.** 8 U.S.C. § 1161(d)(6) provides:

"The provisions of section 1255a(h) ( ... other than paragraph (1)(A)(iii)) shall apply to an alien who has obtained the status of an alien lawfully admitted for temporary residence under this section, during the five-year period beginning on the date the alien obtained such status, in the same manner as they apply to an alien granted lawful temporary residence under section 1255a; except that, for purposes of this paragraph, assistance furnished under the Legal Services Corporation Act (42 U.S.C. 2996 et seq.) or under Title V of the Housing Act of 1949 (42 U.S.C. 1471 et seq.) shall not be construed to be financial assistance described in section 1255a(h)(1)(A)(i)...."

**10.** Section 303(c) creates a special category of aliens called Replenishment Agricultural Workers (RAWS). These are temporary, foreign agricultural workers who are admitted to the country to perform agricultural work in the event of farm labor shortage. *See* 8 U.S.C. § 1161(c).

**11.** We also note that section 1161(d)(6) was added as an amendment to IRCA at the eleventh hour and was not integrated into the previously developed sections of IRCA which Congress drafted over several years. *Compare* H.R.Rep. No. 97-890(II) (1982) (showing that the predecessor to section 245A(h) was first added in 1982) *with* 132 Cong.Rec. H9701-02 (Oct. 9, 1986) (remarks of Cong. Mazzoli) (showing that section 303(d)(6) was an "eleventh hour" provision that was first presented for vote when the House voted on the final IRCA bill).

**12.** Although the plain language of the statute settles the question before us, "we look to the legislative history to determine only if there is 'clearly expressed legislative intention' contrary to that language...." *See INS v. Cardoza-Fonseca,* 480 U.S. 421, 432, n. 12, 107 S.Ct. 1207, 1213, n. 12, 94 L.Ed.2d 434 (1987). Here, the legislative history merely bolsters our conclusion that Congress did not intend the term "financial assistance" to include service programs such as legal services.

[T]hese people live in fear, afraid to seek help when their rights are violated, when they are victimized by criminals, employers or landlords or when they become ill.... [Legalization] would help to prevent the exploitation of this vulnerable population in the work place.

H.R.Rep. No. 99–682(I), 99th Cong., 2d Sess 49 (1986), U.S.Code Cong. & Admin. News 1986, pp. 5649, 5653.[13]

Our literal reading of the term "financial assistance" is thus more consistent with the policies underlying IRCA and is bolstered by examination of the legislative history. Congress intended that the legalization program contained in Section 245A of INA "should be implemented in a liberal and generous fashion...." H.R.Rep. No. 99–682, 99th Congress., 2d Sess. 72 (1986). IRCA thus provides, as an aid to its construction, that its provisions must be construed to "safeguard the constitutional rights, personal safety, and human dignity of United States citizens and aliens." IRCA § 115. More specifically, Congress explained that the disqualification provision of section 245A(h)(1)(A)(i) should be narrowly construed "if the general purposes of the Immigration Reform and Control Act are to be served and if the newly legalized aliens are to be welcomed as full and productive members of our nation." H.R.Rep. No. 98–115(IV), 98th Congress, 1st Sess. 31 (1983).[14] These policy statements add support to our conclusion, based on the plain language of IRCA, that the Attorney General's interpretation is contrary to clear congressional intent.

## CONCLUSION

The plain meaning of the statutory language demonstrates that Congress did not intend the term "financial assistance" to include service programs such as legal ser-

vices. Accordingly, the district court is AFFIRMED.

AFFIRMED.

---

**13.** *See also* Cong.Rec. H10596–97 (daily ed. Oct. 15, 1986) (remarks of Rep. Smith) ("We will be bringing people out of a shadow economy, people will be paying taxes, people will be coming out in the sunshine, there will not be the abuse of workers, employers will not be able to pro-

vide poor-quality jobs for people, they will not be able to oppress people....").

**14.** Although the report by the Committee on Education and Labor discusses the 1983 version of the bill, the provision referred to is identical to the current statutory language.