**ASSOCIATED BUILDERS & CONTRACTORS, GOLDEN GATE CHAPTER INC., Plaintiff,**

v.

**Jeffrey BACA, et al. Defendants,**

**Building and Construction Trades Council of San Mateo County, Intervenor.**

**CHAMBER OF COMMERCE OF the UNITED STATES, Plaintiff,**

v.

**Harvey BRAGDON, et al. Defendants,**

**Northern California and Northern Nevada Pipe Trades District Council # 51 and Contra Costa Building and Construction Trades Council, Intervenors.**

Nos. C–90–1575–CAL, C–90–3581–CAL.

United States District Court,
N.D. California.

June 21, 1991.

Thomas R. Adams, Ann Broadwell, Mark
Aaronson, Adams & Broadwell, San Mateo,
Cal., Carl L. McConnell, Packard Mellberg
& McConnell, Palo Alto, Cal., Peter Nuss-
baum, Altshuler, Berzon, Nussbaum, Ber-
zon & Rubin, San Francisco, Cal., for Inter-
venor Bldg. & Const. Trades Council of San
Mateo County.

City of South San Francisco, Valerie J.
Armento, So. San Francisco, Cal., for Jef-
frey Baca.

Stan Gustavson, City Atty., City of San
Bruno, San Bruno, Cal., for Ralph Carrillo.

James Severson, McCutchen Doyle
Brown & Enersen, San Francisco, Cal.,
Rosemary M. Collyer, Crowell & Moring,
Washington, D.C., for Chamber of Com-
merce.

Peter D. Nussbaum, Altshuler & Berzon,
San Francisco, Cal., Thomas Adams, Ann
Broadwell, Mark Aaronson, Adams &
Broadwell, San Mateo, Cal., Carl L. McCon-
nell, Packard Mellberg & McConnell, Palo
Alto, Cal., for Contra Costa County Bldg. &
Trade and Northern California and North-
ern Nevada Pipe Trades Dist. Council # 51.

Victor J. Westman, County Counsel, Mar-
tinez, Cal., Lillian T. Fujii, for Contra Costa
County Dept. of Bldg. Inspections, Di-
rector, Contra Costa County, and Contra
Costa County Bd. of Sup'rs.

Mark R. Thierman, John W. Prager, Rob-
ert Fried, Thierman Cook Brown & Prager,
San Francisco, Cal., for Associated Build-
ers and Contractors.

**1540**

Mark R. Thierman, Thierman Cook Brown & Prager, San Francisco, Cal., for Merchants & Mfg. Ass'n, amicus.

## ORDER AND OPINION GRANTING SUMMARY JUDGMENT FOR PLAINTIFFS

LEGGE, District Judge.

Plaintiffs in these two cases, the Associated Builders and Contractors ("ABC") and the Chamber of Commerce of the United States ("Chamber"), challenge resolutions passed by the cities of San Bruno and South San Francisco ("Cities") and an ordinance passed by Contra Costa County ("County"). The Building and Construction Trades Council of San Mateo County, the Northern California and Northern Nevada Pipe Trades Council and the Contra Costa County Building and Construction Trades Council ("Councils") have intervened on behalf of defendants. The Pacific Legal Foundation ("Amicus") is participating as Amicus Curiae on behalf of plaintiffs. The two cases were related pursuant to Local Rule 205–2, and are before the court on cross-motions for summary judgment. Because the issues are substantially identical, both cases are addressed in this opinion and order.

### I.

The basic issue is the validity of "prevailing wage rate" legislation affecting private industry, an issue not previously addressed by any nationally reported case.

The Cities' resolutions set conditions for the issuance of building permits for private construction projects. Briefly summarized, in order to receive a permit a builder must either: (1) post a bond guaranteeing timely completion; or (2) agree to pay the general

prevailing *per diem* wages (as determined by the California Department of Industrial and Labor Relations pursuant to California Labor Code § 1770 *et seq.*) to construction workers on projects costing more than $250,000.[1] The County's ordinance also requires the payment of prevailing *per diem* wages on certain private construction projects that cost more than $500,000.[2] The resolutions and the ordinance contain discretionary waiver provisions.[3]

ABC challenges the Cities' resolutions on the grounds that they: (1) are preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, (2) are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (1982) ("ERISA"), (3) constitute a taking in violation of the 5th Amendment, (4) discriminate based on race or gender, and (5) violate the right to travel. Chamber challenges the County's ordinance on the grounds that it: (1) is preempted by the NLRA, (2) is preempted by ERISA, and (3) violates the Contract Clause of the U.S. Constitution. Defendants and intervenors seek a declaratory judgment that the resolutions and the ordinance are valid.

The parties agree that these issues are one of law, and that there are no genuine issues of material fact in dispute.

### II.

The court must initially determine whether the exercise of jurisdiction by this court is proper. The Cities and Councils move for summary judgment, arguing that ABC lacks standing to challenge the resolutions, and that the issues are not ripe for adjudication.[4]

---

1. San Bruno Resolution 1990–4 and So. San Francisco Resolution No. 141–88 were amended during the course of this litigation on November 13 and 14, 1990 respectively. *See* City of San Bruno Resolution No. 1990–71 and City of So. San Francisco Resolution No. 161–90. The court addresses the resolutions as amended.

2. *See* Contra Costa County Ordinance No. 90–72, as amended on December 4, 1990 by Ordinance

3. *See* San Bruno Resolution No. 1990–71 ¶ K; So. San Francisco Resolution No. 161–90 ¶ 4; Contra Costa County Ordinance No. 90–72 art. 526–2.16.

4. No jurisdictional challenge was raised to Chamber's standing to challenge the County's ordinance.

### A.

ABC alleges standing as a trade association of builders, developers and owners in the construction industry. ABC's members conduct business in South San Francisco, San Bruno and elsewhere. ABC's members allegedly advocate that a free market should set the prices for construction and construction-related services.

An association may have standing to assert the claims of its members, even if it has suffered no injury from the challenged activity. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). In *Hunt v. Washington State Apple Advertising Com.,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), the U.S. Supreme Court set forth the requirements for an association to establish standing under Article III of the U.S. Constitution:

> ... an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*See also California Rural Legal Assistance, Inc. v. Legal Services Corp.,* 917 F.2d 1171, 1174 (9th Cir.1990).

Defendants do not contest that ABC meets the second and third requirements of the test: the interests of ABC in free enterprise wage rates are opposed to the prevailing wage rate legislation and are germane to the purpose of ABC. In addition, there is no need for individual members of ABC to participate in this action, since ABC's challenge is based on the alleged facial invalidity of the resolutions. Thus, the standing issue turns on whether ABC's members would otherwise have standing to sue in their own right.

ABC must show concrete injury to itself or its members. *Warth v. Seldin,* 422 U.S. at 498–99, 95 S.Ct. at 2204–05; *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The injury must be "distinct and palpable," *Gladstone, Realtors v. Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). And a plaintiff must show "an injury to himself that is likely to be redressed by a favorable decision." *Simon,* 426 U.S. at 38, 96 S.Ct. at 1924. The requirement of injury is a "rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome ..." *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972) (recreational use of a valley by members sufficient for standing to challenge Forest Service approval of a ski resort).

The Cities argue that no specific showing of injury has been made. They claim that contingencies in the resolutions, such as the waiver provisions, make the economic consequences on ABC's members uncertain. However, at least one ABC member has filed a declaration stating that it is the apparent low bidder for a construction project in South San Francisco that is subject to the resolution. The member alleges that application of the prevailing wage provision will result in substantial economic costs. The member apparently cannot or does not intend to apply for a waiver.

In addition, ABC's members will necessarily be forced to increase their bids on projects covered by the resolutions, in order to compensate for the costs of compliance, or they must absorb the increased costs. ABC's members did not previously follow the wage and benefit structure imposed by the Cities' resolutions. Nor were they previously required to post completion bonds for projects covered by the resolutions. Therefore, as a result of the resolutions, they will be required to add to their bids the additional costs of either paying the prevailing wages or posting a completion bond, or they must pay those increased costs themselves. In either event there are direct economic consequence to ABC's members. ABC has also submitted declarations from general contractors who contract with ABC's member subcontractors on their projects. These declarations establish that the contractors now require

ABC's member subcontractors to comply with the resolutions in submitting their bids.

These resolutions directly affect contractors, such as ABC's members, who do not now pay the prevailing wage rates. The economic consequences to ABC's members, both in terms of increased direct costs and reduced competitiveness within the construction industry, satisfies the injury-in-fact requirement.

There can be no question that the relief requested by ABC will redress the alleged invalidity of the resolutions. If the resolutions are found to be invalid, ABC's members will be relieved of any duty to comply with the resolutions, thereby eliminating the economic harm to them. Thus, both the injury-in-fact and the redressability elements of the standing requirement are met by ABC.

#### B.

The Cities also argue that ABC's challenge is not ripe for judicial determination. Even if the court accepts the Cities' statement that no penalties under the resolutions have yet been applied to an ABC member, they inevitably will in the near future. In addition, because the injury occurs at least in part during the bidding process on a project (because ABC's members must determine their bids at an early stage in the contract-awarding process), it is not necessary to prove that penalties have been applied to an ABC member on a specific project in order to establish ripeness.

Further, the various factual settings in which the resolutions might be enforced in the future are largely irrelevant to the issues raised in this case. Since plaintiffs bring a facial challenge to the validity of the resolutions, the nuances of specific instances in which the resolutions could be applied will not materially aid the court in determining the validity of the resolutions.

"Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974) (citations omitted). Waiting for the further development of a factual record will not aid the court in deciding the merits of ABC's challenge. These cases are ripe for judicial determination.

#### III.

ABC and Chamber seek invalidation of the resolutions and the ordinance on the ground that they are preempted by the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1982) ("NLRA"). Federal preemption is founded on the Supremacy Clause of the Constitution. U.S. Const. art. VI, cl. 2. The NLRA preempts state and municipal laws concerning conduct that Congress intended to be unregulated. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 749, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985). The crucial inquiry is "whether Congress intended that the conduct involved be unregulated because it is left 'to be controlled by the free play of economic forces.'" *International Asso. of Machinists & Aerospace Workers v. Wisconsin Employment Relations Com.*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976) (citing *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971)).[5] The rationale for this policy is to avoid upsetting "the balance of power between labor and management expressed in our national labor policy." *Teamsters v. Morton*, 377 U.S. 252, 260, 84 S.Ct. 1253, 1258, 12 L.Ed.2d 280 (1964).

#### A.

ABC and Chamber argue that the resolutions and the ordinance prescribe the wages that must be paid by private employers to their employees, in violation of the rights of both employers and employees to

---

**5.** A related preemption doctrine prohibits states and local governments from regulating activities that the NLRA protects or prohibits. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). This type of preemption is not applicable here.

collectively bargain under the NLRA without government interference. 29 U.S.C. § 151. Legislation setting wages at a "prevailing" wage level, plaintiffs contend, improperly removes wages from the bargaining process.[6]

Defendants contend that the resolutions and the ordinance do not interfere with the collective bargaining process, and are valid exercises of the police power. "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the state. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety ... are only a few examples." *Metropolitan Life*, 471 U.S. at 756, 105 S.Ct. at 2398 (citation omitted). A compelling local interest, "deeply rooted in local feeling and responsibility" may provide the basis for permitting state regulation where preemption is claimed. *San Diego Building Trades Council v. Garmon*, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (1957).

The U.S. Supreme Court has set some parameters for federal preemption of local regulations. In *Metropolitan Life*, the Court determined that a mandated minimum-benefit law was not preempted by the NLRA. The state law required that specified minimum mental health care benefits be provided to residents under employee health care plans if those plans covered hospital and surgical expenses. The Court rejected the argument that the state law was preempted, noting that the "NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." *Metropolitan Life*, 471 U.S. at 753, 105 S.Ct. at 2396. The Court also stated that:

The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment. Neither inequality of bargaining power nor the resultant depressed wage rates were thought to result from the choice between having terms of employment set by public law or having them set by private agreement. No incompatibility exists, therefore, between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimum substantive requirements on contract terms negotiated between parties to labor agreements, *at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA.*

*Id.* at 754–55, 105 S.Ct. at 2397 (emphasis added).

The question is whether, consistent with the goals of the NLRA, a prevailing wage rate for construction labor on private projects is a "minimum labor standard."[7] The Supreme Court declined to define "minimum labor standards" in *Metropolitan Life*. However, the Court subsequently noted in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) that "preemption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the state."

In *Fort Halifax*, the Supreme Court upheld a state statute requiring employers, in the event of a plant closing, to make a one-time severance payment to employees not covered by a contract providing for severance pay. The Court found that the law was a valid exercise of the state's police power. Since "Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety," the Court held that the

---

6. It is irrelevant that the employees of ABC's member companies may be non-union, since the "NLRA grants the right to collectively bargain to all employees, union and non-union." *Livadas v. Aubry,* 749 F.Supp. 1526, 1534 (N.D.Cal.1990).

7. Federal minimum wage laws do not preempt any "state law or municipal ordinance establishing a minimum wage higher than the minimum wage established [by] the federal law ..." 29 U.S.C. § 218(a). In addition, the California Labor Code states that it does not "restrict the exercise of local police powers in a more stringent manner." § 1205 (covering "employees").

state statute was not preempted. *Id.* at 22, 107 S.Ct. at 2223 (citing *Metropolitan Life,* 471 U.S. at 756, 105 S.Ct. at 2398).

Cases in which courts have overturned state laws on preemption grounds are consistent with the Supreme Court's focus on protecting the collective bargaining process. Those cases have involved actions by a government that made it "a party to the negotiations." *See Golden State Transit Corp. v. Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (overturning state law that conditioned grant of state taxicab franchise on settlement of strike with drivers); *Machinists,* 427 U.S. 132, 96 S.Ct. 2548 (overturning state law prohibiting employees from refusing to work overtime during collective bargaining negotiations); *Associated Builders & Contractors v. Massachusetts Water Authority,* 935 F.2d 345 (1st Cir.1991) (en banc), (citing pervasive state intrusion into the bargaining process).

The Ninth Circuit addressed this issue of NLRA preemption in *Bechtel Construction Inc. v. United Brotherhood of Carpenters & Joiners,* 812 F.2d 1220 (9th Cir. 1987). In *Bechtel,* the state Division of Apprenticeship Standards prohibited an employer from paying less than state-approved standards for apprentice wages, despite a collective bargaining agreement establishing wage reductions. The court addressed the pre-emption issue, stating that "section 7 [of the NLRA] would preempt any attempt to enforce the Approved Standards against collectively bargained-for wage rates." *Id.* at 1225. The *Bechtel* court distinguished *Metropolitan Life* on two grounds. First, the court noted that the legislation differed from that in *Metropolitan Life* because the standards could be "undercut" by approval of the state agency, and a "minimum, by definition, cannot be undercut." *Id.* at 1226. Second, the court noted that *"Metropolitan Life* failed to consider that such standards can sometimes have a serious effect on the collective bargaining process," because such state-established minimum wages would upset bargained-for wage scales. *Id.*

The *Bechtel* court took exception to required state involvement in any collective bargaining agreement establishing wage levels below the state standards. The court said that this "mandate[d] state interference in the collective bargaining process." *Id.* at 1226. After *Bechtel* was decided, *Fort Halifax* held that a minimum labor standard is not preempted merely because it can be undercut by private agreement. Nevertheless, *Bechtel* is still a decision of this circuit overturning a law because of state involvement in the negotiation process. The court held that the participation of the state in the collective bargaining process is inconsistent with section 7 of the NLRA. This court is of course bound by the holding of *Bechtel.*

Here, the resolutions and the ordinance interject the state and local government into the collective bargaining process. Prevailing wages are calculated by the state labor department and are based on wages actually paid in the construction industry. Those standards are calculated by referring to the results of bargaining between other employers and their employees or unions. The imposition by the state of wage rates determined by the collective bargaining of others involves both the state and third parties in the collective bargaining process.

■ *Bechtel* clearly holds that the negotiation of wage rates is a protected activity under section 7: "Section 7 guarantees the freedom of workers to join together and designate representatives to negotiate the terms and conditions of employment." *Id.* at 1225. The effect of these city and county laws is to replace bargained-for wages with the prevailing wages determined by the state by reference to the agreements of third parties.

Defendants argue that there is no principled distinction between this prevailing wage legislation and the minimum labor standard laws upheld in *Metropolitan Life* and *Fort Halifax.* That assumes that in this case we are dealing with a minimum wage rate set by legislation. However, two important differences exist here:

First, the Supreme Court noted that "[m]inimum state labor standards affect union and non-union employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA." *Metropolitan Life,* 471 U.S. at 755, 105 S.Ct. at 2397. The resolutions and the ordinance here are different. They are examples of "an interest group deal in public-interest clothing." *National Solid Wastes Management Ass'n v. Killian,* 918 F.2d 671, 688 (7th Cir.1990). The resolutions and the ordinance are designed to protect certain construction workers, primarily members of certain unions, from competition in wages. Their unions in effect would set the prevailing wages for the state. And the resolutions and ordinance then apply those rates to non-union builders and contractors, making them less competitive than they might be through free bargaining.

■ Second, virtually by definition, a "prevailing" wage is not a "minimum" wage. One is a definitive standard, applicable to *all* workers. The other is a standard determined by the agreements of a certain segment of workers and employers.

■ This court concludes that the prevailing wage standard is an impermissible interference in the collective bargaining process, as prohibited by *Bechtel,* and exceeds the scope of a "minimum" wage defined in *Metropolitan Life* and *Fort Halifax.* These prevailing wage laws effectively establish the wages to be paid, thereby substituting the state's determination of prevailing wages, as set by a certain segment of industry, for the results of the collective bargaining process. The resolutions and the ordinance are therefore preempted by the NLRA.

### B.

The resolutions and the ordinance also interject local government into the negotiating process because of certain exceptions

to the prevailing wage requirements. The resolutions provide for an alternative means of compliance—the posting of a completion bond.[8] And the resolutions and the ordinance both contain waiver provisions for "hardship" cases if compliance is not economically feasible or the project will provide overriding economic benefits. The posting of a completion bond releases the employer from any obligation to pay prevailing wages. A bonding requirement is usually a financial matter between the contractor and the owner, and is not a part of the employee-employer relationship. Yet under the resolutions it becomes integrally involved in the setting of wages. This option, which is unrelated to the issue of wages, will affect the wages paid on the applicable projects.

Under the analysis in *Bechtel,* this court concludes that the bond provisions authorize the Cities to alter the wages that must be paid, without any participation by the employees themselves. Indeed, the Supreme Court in *Metropolitan Life* noted that the state mandated benefit laws in that case were in part designed to ensure that *each* employee covered would receive the mandated benefit. *Metropolitan Life,* 471 U.S. at 755, 105 S.Ct. at 2397 (citing *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728 at 739, 101 S.Ct. 1437 at 1444, 67 L.Ed.2d 641 (1981) (emphasis in original). Because employers may pay different wages by posting completion bonds, the prevailing wage provisions cannot be treated as a minimum labor standard.

The waiver provisions of the resolutions and the ordinance compel the same conclusion. These discretionary provisions, which provide the Cities and the County with the power to undercut the prevailing wage rates, are similar to the provisions in *Bechtel* that were determined to "mandate state interference in the collective bargaining process." *Bechtel,* 812 F.2d at 1226.[9]

---

**8.** The County Ordinance does not contain a completion bond option. Therefore, any reference to such provision applies only to the resolutions of the Cities. *See* San Bruno Resolution

No. 1990–71 ¶ J.1; So. San Francisco Resolution No. 161–90 ¶ 2.A.

**9.** Defendants argue that the "undercutting" analysis in *Bechtel* is undermined by the subse-

The resolutions and the ordinance are therefore preempted by the NLRA.

## IV.

ABC and Chamber also argue that the resolutions and the ordinance are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1982). ERISA preempts state laws which "relate to" and "purport to regulate" employee benefit plans. 29 U.S.C. § 1144(a), (c)(2).

■■■ "Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *FMC Corp. v. Holliday,* — U.S. —, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990) (citation omitted). The U.S. Supreme Court has specifically noted that ERISA is "conspicuous for its breadth. It establishes as an area of exclusive federal concern the subject of every state law that 'relate[s] to' an employee benefit plan governed by ERISA." *Id.* A law relates to an employee welfare plan if it has "a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). According to the Ninth Circuit, a law must both "relate to" and "purport to regulate" employee benefit plans to be preempted by ERISA. *Martori Bros. Distributors v. James–Massengale,* 781 F.2d 1349, 1356 (9th Cir.), *modified,* 791 F.2d 799 (9th Cir.), *cert. denied,* 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 722 (1986); *Retirement Fund Trust of Plumbing v. Franchise Tax Board,* 909 F.2d 1266, 1280–81 (9th Cir. 1990).

### A.

The resolutions and the ordinance do not explicitly regulate employee benefits. But they do refer to employee benefits by incorporating the definition of *per diem* wages set forth in California Labor Code § 1773.1. *Per diem* wages are calculated by adding the monetary value of prevailing benefits to the wage base.[10] Under the resolutions and the ordinance, *per diem* wages must equal the sum of prevailing wages and benefits, less any employer payments made for employee benefits. In addition, *per diem* wages paid to employees as earnings, rather than in the form of benefits, must not be less than the prevailing wage base.[11]

The effect of these provisions on employee benefit plans depends on the level of benefits an employer provides. An employer providing lower than the prevailing level of benefits will be required to pay additional wages or benefits in order to comply. An employer paying a higher level of benefits will not be able to deduct more than the prevailing benefit level in determining the wages to be paid to the employees.

Plaintiffs argue that the resolutions and the ordinance essentially mandate the establishment of a "system" whereby employers must compute benefit payments in order to determine *per diem* wages. They further argue that such a system requires an employer to make ongoing calculations and adjustments to determine whether the equivalent of prevailing wages or benefits has been paid to its workers, including calculations depending on: the type of job; the hours worked; whether the work was on a covered project; and whether some workers were only part-time. There is also a question of whether the benefit plans cover permanent employees.[12] And some

quent Supreme Court case in *Fort Halifax.* But the key point is the participation of the government in undercutting minimal labor standards, not the mere fact that the standards could be undercut.

**10.** Although specific references to "employer payments" were deleted from the resolutions and the ordinance by the amendments, payment of employee benefits are still considered in the calculation of *per diem* wages. Such wages are determined according to California Labor Code

§§ 1773 and 1773.1, which expressly include employer payments as part of "per diem wages."

**11.** *See* San Bruno Resolution No. 1990–71 ¶ D; So. San Francisco Resolution No. 161–90 ¶ 2.c.; Contra Costa Ordinance No. 90–116 § 526–2.802.

**12.** The County takes the position that permanent employees are not covered by the ordinance. This interpretation is not evident from its face. However, to the extent that this inter-

of the calculations and adjustments must be made retrospectively.

 If an administrative scheme were required merely to pay wages, but not other benefits, ERISA preemption would not be implicated. However, the definition of *per diem* wages necessitates reference to, and calculation of, employer contributions to employee benefit plans. Complex calculations are required to determine the prevailing base wage that must be paid. The calculations can only be made after referencing the dollar value of benefits paid. Thus, the wage requirement incorporates employee benefits into the prevailing wage statute. This incorporation can only be accomplished by requiring *per diem* wages that "refer to" and "regulate" employee benefit plans.

The Supreme Court decision in *Fort Halifax* does not support defendants' argument to the contrary. In that case, the Supreme Court rejected the argument that "ERISA preempts state laws relating to certain employee benefits, rather than to employee benefit plans," and held that a state statute requiring a lump sum severance pay was not preempted. 482 U.S. 1, 19, 23, 107 S.Ct. 2211, 2221, 2223. The Court noted that the lump-sum payment "requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control." *Id.* The Court's recent discussion of *Fort Halifax* noted that although the "state law required payment of severance benefits, which would normally fall within the purview of ERISA, it was not preempted because the statute did not require the establishment or maintenance of an ongoing plan." *Ingersoll–Rand Co. v. McClendon,* — U.S. —, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990) (citation omitted).

The present cases differ, because the employers will be forced to implement an administrative scheme to calculate on a regu-

lar basis the wages and benefits paid to individual workers on projects covered by the resolutions and the ordinance. Those contractors will be required to determine the cash equivalent of the benefits provided. At a minimum, employers will be forced to calculate wages and benefits on covered projects separately from other projects, creating an ongoing administrative system. At least with respect to some of plaintiffs' members, the resolutions and the ordinance impose on-going administrative burdens that fall within the parameters of an ERISA plan. *See Fort Halifax,* 482 U.S. at 14 n. 9, 107 S.Ct. at 2219 n. 9 ("the ongoing, predictable nature of this obligation therefore creates the need for an administrative scheme to process claims and pay out benefits, whether those benefits are received by beneficiaries in a lump sum or on a periodic basis.")

The resolutions and the ordinance are therefore preempted by ERISA.

### B.

 The resolutions and the ordinance are also preempted by ERISA because they have a disproportionate impact on the benefits of various employees. The Second Circuit recently held that a statute which required prevailing fringe benefits, or a cash payment equal to the cost of compliance, was preempted by ERISA. *General Electric Co. v. New York State Dept. of Labor,* 891 F.2d 25, 28–31 (2d Cir.1989). The court noted that the payment of the equivalent *cost* of fringe benefits to the employee may be of lesser value to the employee than the benefits themselves. The court determined that the statute "related to" ERISA plans of certain employers and was therefore preempted.

Similarly, the resolutions and the ordinance relate to and regulate ERISA plans because they provide for employer compliance through the payment of benefits or the cash equivalent. Because these alternate provisions for compliance have disproportionate effects on employees, they regu-

pretation remains in effect, the burdens are somewhat less than the burdens imposed by the

Cities' resolutions. This difference, however, does not alter this court's conclusions.

late ERISA benefits by altering the calculation or payment of benefits under ERISA-covered pension plans. *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 524, 101 S.Ct. 1895, 1906–07, 68 L.Ed.2d 402 (1981).

### C.

By limiting the amount of benefits that can be "subtracted" from the *per diem* wage calculations, the resolutions and the ordinance also relate to and regulate ERISA plans by discouraging payment of benefits at higher than prevailing levels. They place a limit on employers' abilities to meet the total compensation package, because the amount of wages paid directly to the workers may not be less than the base wage rate. If the total compensation package is equal to wages plus benefits, then the requirement that wages must be paid in cash discourages higher-than-standard contributions towards benefits. An employer could provide higher-than-standard benefits, but that employer would not be able to compensate for that added cost by paying wages below the base wage level.

■ Thus, although the ordinace and the resolutions do not mandate the creation of an ERISA benefit plan, or a minimum level of plan benefits, it does discourage employer contributions in excess of the prevailing amounts.

In determining the scope of ERISA preemption, Congress expressed concern that to require plan providers to design their programs in an environment of differing State regulations would complicate the administration of the nationwide plans, producing inefficiencies that employers might offset with decreased benefits. *See Fort Halifax*, 482 U.S. at 10, 107 S.Ct. at 2217. Thus, where a "patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation," the Court has applied preemption to ensure that benefit plans will be governed by a single set of regulations. *Id.* at 11, 107 S.Ct. at 2217.

The effect of the resolutions and the ordinance is to discourage employers from paying benefits at a level other than that established as "prevailing." Not only does this directly implicate Congress' desire to avoid a patchwork of state regulation, it also imposes differing requirements on employers within a single state or even a single locality. Employers will be faced with the choice of: (1) setting up separate benefit plans for employees on covered projects; (2) adjusting participation in existing plans to compliance levels; or (3) abandoning ERISA benefit plan benefits altogether.

Each of these alternatives represents regulation of ERISA plans in a manner that may harm employees and create inefficiencies in the implementation of ERISA plans on a national, state and even a local level. They illustrate the extent to which the resolutions and ordinance "relate to" and "purport to regulate" ERISA benefit plans. The inconsistencies and burdens created by this local legislation is within the preemptive intent of Congress to assure that ERISA plans are governed by a single set of federal regulations. The resolutions and ordinance undermine this goal and are therefore preempted.

### V.

The Chamber asserts a claim under the U.S. and California Constitutions that the legislation impairs the obligations of contracts. U.S. Const. art. I, § 10; Cal. Const. art. I, § 9. Plaintiffs did not raise this issue in their challenge to the resolutions. However, for the reasons to be discussed, the court believes that the resolutions are subject to the same challenges and they will be discussed together. The contracts allegedly impaired are the collective bargaining agreements between the plaintiffs' members and their respective labor unions. Plaintiffs contend that the legislation would require those members who operate under collective bargaining agreements to alter their contracts in order to comply, resulting in substantial and unexpected liability.

Chamber has submitted declarations from members who have collective bargaining agreements, including Shell, Unocal

and Timec.[13] Declarations were also submitted in support of the contention that the collective bargaining agreements would be affected by the ordinance. The record demonstrates that Chamber has established that contracts with its members' employees will be affected by the ordinance.

#### A.

■ "The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (citation omitted). The severity of the impairment increases the level of scrutiny to which the legislation will be subjected. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978). Total destruction of contractual expectations is not necessary for a finding of substantial impairment. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 31, 97 S.Ct. 1505, 1522, 52 L.Ed.2d 92 (1977).

■ If the legislation constitutes a substantial impairment, the government must demonstrate a significant and legitimate public purpose behind the regulations, *United States Trust*, 431 U.S. at 22, 97 S.Ct. at 1517–18, such as remedying a broad and general social or economic problem. *Allied Structural Steel*, 438 U.S. at 247, 249, 98 S.Ct. at 2723–24, 2724–25. The requirement of demonstrating a legitimate public purpose assures that a government is exercising its police power, rather than providing a benefit to special interests.

If a legitimate public purpose is demonstrated, the next inquiry is whether the changes in the rights and responsibilities of the contracting parties compelled by the legislation are reasonable and are appropriate to the public purposes of the legislation. *United States Trust*, 431 U.S. at 22, 97 S.Ct. at 1517.

#### B.

■ Existing collective bargaining contracts will be substantially impaired by this legislation. When wages and benefits are set by law at not less than a particular level, there is little remaining to bargain about except upward departure. According to the record, wages now being paid would rise under the ordinance, in some cases nearly one hundred percent. The Supreme Court found a change to a pension fund provision to be a substantial impairment in *Allied Structural Steel*, 438 U.S. at 246, 98 S.Ct. at 2723, calling it a "basic term" of the employment contract.

#### C.

■ Is there a significant and legitimate public purpose for the legislation such as the remedying of a broad and general social or economic problem? To answer this question the court must examine the legitimacy of the "ends," and then examine the appropriateness and necessity of the means chosen to achieve those ends.

It has been long established that:
> the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This … police power is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. *Allied Structural Steel*, 438 U.S. at 241, 98 S.Ct. at 2721 (citing *Manigault v. Springs*, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905)).

A counterbalance to that general statement of support for the police power is *Allied Structural Steel* itself. In that case, the Supreme Court held that "[t]he State had not acted to meet an important

---

13. Timec operates under a collective bargaining agreement and would be affected by the ordinance if the ordinance applies to its work. Timec became a member of Chamber after the summary judgment motion was filed.

general social problem. The pension statute had a very narrow focus: it was aimed at specific employers. Indeed, it even may have been directed at one particular employer planning to terminate its pension plan when its collective-bargaining agreement expired." *Energy Reserves Group,* 459 U.S. at 412 n. 13, 103 S.Ct. at 705 n. 13. The question is therefore whether the objectives of the legislation here are broad, generalized social matters, or are benefits granted to "special interests."

The *stated* objectives are the promotion of safety, the reduction of dependence on government subsidies, and the promotion of the local economy. The resolutions also add the objective of the timely completion of construction projects.[14]

There can be little doubt that safety, both from a public and a worker safety perspective, is a legitimate area of police power regulation. Public economic benefits may also be.

However, the *substance* of the resolutions and the ordinance serve a different objective. Rather than promoting safety and broad economic goals, or even the timely completion of construction projects, the resolutions and the ordinance are instead economic legislation for the benefit of certain groups, primarily the members of certain unions. For example:

(1) The remedies created by the resolutions and the ordinance are informative. There is only one private right of action created, which authorizes private litigation by workers or their unions for the payment of the prevailing wages. That remedy does not further any goal of safety or timely completion of a project. It merely assures that the protected group of workers can sue for compensation.

(2) The resolutions and the ordinance contain waiver provisions that allow a project to be built in spite of noncompliance with the legislation if certain conditions are met.[15] Although these waiver provisions do address certain economic matters, the relationship between prevailing wages and safety, (the key premise stated in the legislation), is not addressed by the waivers. Despite the professed concern about safety, and the stated policy that safety is to be achieved through the payment of prevailing wages, waiver is permitted on the mere statement that the construction can proceed as if the requirements of the resolutions or the ordinance had been met.

(3) A contractor may comply with the resolutions in *one* of two ways, by posting a bond for timely completion *or* by paying the prevailing *per diem* wage rate.[16] There is an absence of a nexus between these alternative compliance options and the stated objectives of the legislation. The posting of a completion bond does not have a rational relationship to the stated goal of increasing safety. And the payment of prevailing wages does not serve the stated objective of the timely completion of projects. One might argue that together these two options serve the two purposes. But these compliance options are alternatives.

(4) The history of the legislation is also informative. The original resolutions, in effect at the time this suit was filed, were ostensibly passed by the Cities to serve the identical legislative purposes stated in the now amended resolutions. However, the original resolutions contained a third option for compliance: they exempted an employer who was a signatory to a collective bargaining agreement with the local chapter of the AFL–CIO.[17] Under that provision, payment of less than prevailing wages to AFL–CIO union workers would constitute compliance, whereas payment of the same wage to a non-union worker, or to

---

**14.** San Bruno Resolution No. 1990–71 ¶ A; So. San Francisco Resolution No. 161–90 ¶ 1; Contra Costa Ordinance No. 90–72 art. 526–2.426.

**15.** Contra Costa County Ordinance No. 90–72 art. 526–2.16; San Bruno Resolution No. 1990–71 ¶ K; So. San Francisco Resolution 161–90 ¶ 4.

**16.** San Bruno Resolution No. 1990–71 ¶ J; So. San Francisco Resolution No. 161–90 ¶ 2.d. The Contra Costa County Ordinance does not contain a bond option for compliance.

**17.** San Bruno Resolution No. 1990–4; So. San Francisco Resolution No. 141–88.

the member of a different union, would not.

Read as a whole, the legislation operates for the economic benefit of those workers who are members of certain unions. The stated objectives merely give a public policy appearance to what is really private interest legislation. As such, the substantial impairment of contractual relationships does not meet the legitimate public purpose of *Allied Structural Steel.*

## VI.

■■■ ABC and Amicus contend that the Cities' resolutions violate the Fifth Amendment to the Constitution because they: (1) take private property by imposing conditions upon construction that are unrelated to the construction itself; and (2) impose a burden upon property owners that should be borne by the public as a whole.[18] Plaintiff and Amicus primarily rely upon the Supreme Court decision in *Nollan v. California Coastal Com.,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), that a nexus. must exist between the conditions that must be met for a building permit and legitimate police power goals. But before nexus is addressed, the first question is whether these regulations are a taking of private property.

"The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The "Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Id.* at 124, 98 S.Ct. at 2659. Indeed, "whether a particular restriction will be rendered invalid by the

government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances [in that] case." *Id.*

These cases do not involve a physical taking, but rather an alleged "regulatory" taking. The Supreme Court has "long recognized that land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.' " *Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147 (citing *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)).

The Cities claim that the resolutions are not land-use regulations, and that they do not restrict the ownership, possession, or use of land which is the constitutional domain of the Takings Clause of the Fifth Amendment. They argue that the resolutions merely impose legitimate building permit conditions, and in no way interfere with the use of the property. Plaintiff and Amicus contend that the resolutions condition a property owner's right to develop his land on compliance with the terms of the resolutions, resulting in a regulatory taking under *Nollan.* They claim that the resolutions therefore interfere with the right to develop property.[19]

The resolutions are not traditional land-use regulations, in that they do not condition development of property on a restriction of its *use.* The cases addressing land-use regulations as takings have focused on the *use* restriction, and not on conditions for building a project that is otherwise approved for construction. *See Penn Central,* 438 U.S. 104, 98 S.Ct. 2646 (historic preservation); *Agins,* 447 U.S. 255, 100 S.Ct. 2138 (zoning); *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (flood control); *Pennell v. San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (rent control).

---

**18.** Chamber did not challenge the ordinance on this ground, although briefs on the Fifth Amendment issue were submitted to the court by intervening and amicus parties.

**19.** In a footnote in *Nollan,* the Court stated that "the right to build on one's own property—even

though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a 'governmental benefit.' " 483 U.S. at 834 n. 2, 107 S.Ct. at 3147 n. 2.

The resolutions in this case are more akin to building conditions than land-use regulations. Although ABC and Amicus attempt to characterize the resolutions as land-use regulations, the resolutions do not restrict the right to develop or use land. Even though compliance with the resolutions will be necessary for a construction project to go forward, the right to develop and use will not be infringed, but will instead be conditioned and rendered more costly.

The only "right" that ABC can claim is being taken is to bargain for lower costs of construction, and hence lower costs of development. Such a right, if it exists, does not implicate a property right under the Fifth Amendment. This claim is more properly characterized as a substantive due process cause of action. The parties did not argue, and this court does not express any opinion on, that due process issue.

This court therefore does not reach the nexus analysis of *Nollan.* Because there is no "taking" here, this legislation is not subject to the heightened scrutiny of *Nollan.*

### VII.

ABC at first argued that the constitutional right to travel was violated by the resolutions. The argument was based on the original, unamended versions of the resolutions. The amendment to the resolutions eliminated any factual basis for this argument. The constitutional right to travel is not now implicated by the Cities' present resolutions.

### VIII.

ABC contends that the resolutions discriminate against the poor, women, and minorities.[20] By providing a "subsidy" for the prevailing construction industry, which is allegedly dominated by white males, the resolutions are alleged to be "de facto" discrimination in violation of the fourteenth amendment to the United States Constitution.

ABC points to the alleged history of discrimination in favor of white males in the San Francisco area construction industry, with citations to lawsuits and consent decrees. *See, e.g., Associated General Contractors v. City of San Francisco,* 748 F.Supp. 1443 (N.D.Cal.1990); *Richmond v. J.A. Croson, Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In addition, ABC notes that the resolutions apply only to the construction workers, and not to other staff such as secretaries.

■ To the extent that ABC is alleging discrimination against a protected class, thereby invoking a higher level of scrutiny from the courts, it must allege that the discrimination is intentional or purposeful under *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); or serves as a mere pretext for invidious discrimination. *See Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). Disproportionate impact is insufficient to hold official action unconstitutional. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). No such proof has been presented. Therefore, this claim is not sufficiently supported to withstand summary judgment in favor of defendants.

### IX.

Accordingly, summary judgment is granted in favor of plaintiffs and against defendants, in both cases, on the grounds that the resolutions and the ordinance are preempted by the NLRA and ERISA and unconstitutionally impair the obligations of contracts.

Within seven days of this order plaintiffs may file and serve proposed forms of judgment to be entered in each case. Defendants may file and serve written objections to the forms of judgment within seven days of their receipt. The court will then consid-

---

**20.** Chamber did not raise this challenge to the ordinance.

er the forms and objections, and will enter a signed judgment in each case.

IT IS SO ORDERED.