**DILLINGHAM CONSTRUCTION N.A., INC., a California corporation, and Manuel J. Arceo, d/b/a Sound Systems Media, Plaintiffs,**

v.

**COUNTY OF SONOMA, Department of Industrial Relations, Division of Labor Standards Enforcement and Division of Apprenticeship Standards, administrative agencies of the State of California, Gail W. Jesswein, in his official capacity as Chief of the Division of Apprenticeship, and James Curry, in his official capacity as Labor Commissioner, Defendants.**

No. C 90–1272 FMS.

United States District Court,
N.D. California.

Dec. 11, 1991.

---

Richard N. Hill, Littler Mendelson Fastiff & Tichy, San Francisco, Cal., for plaintiffs.

John M. Rea, H. Thomas Cadell, Jr., Ramon Yuen–Garcia, Div. of Labor Standards Enforcement, Dept. of Indus. Relations, San Francisco, Cal., for defendants.

Peter D. Nussbaum, Altshuler & Berzon, San Francisco, Cal., for International Broth. of Elec. Workers.

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

FERN M. SMITH, District Judge.

## INTRODUCTION

At issue in this case is the State of California's authority to establish and enforce minimum employment standards for apprentices. The State of California (the "State") requires that public works contractors who employ apprentices employ only those apprentices who participate in apprenticeship programs with state-approved standards. Defendants in this case include two state agencies which enforce apprenticeship standards; the head of each of those agencies; and the County of Sonoma. All defendants maintain that the State has the authority to establish and enforce minimum employment standards. Based on this authority, defendants have withheld money from plaintiffs for non-compliance with prevailing wage requirements that relate to apprentice status. Defendants have moved for summary judgment.

The plaintiffs, Dillingham Construction and Manuel J. Arceo, d/b/a Sound Systems Media ("Sound Systems"), argue that the State may not interfere in the collective bargaining process by trying to define apprentices. Plaintiffs claim that defendants' reasons for withholding the money are preempted by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1381 ("ERISA") and/or the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("NLRA"). Plaintiffs have also moved for summary judgment.

For the reasons set forth below, defendants' Motion for Summary Judgment is GRANTED, and plaintiffs' Motion for Summary Judgment is DENIED.

## BACKGROUND

Defendant County of Sonoma requested bids for the construction of a detention facility, known as the Sonoma County Main Adult Detention Facility (the "Project"). In the Spring of 1987, plaintiff Dillingham Construction won the construction contract and became the general contractor for the Project. The electronic installation work was subcontracted to co-plaintiff Manuel J. Arceo, d.b.a. Sound Systems Media ("Sound Systems").

Sound Systems asked Sonoma County for a determination of the appropriate prevailing rates applicable to all work on the Project.[1] Sonoma County gave Sound Systems the rate information requested, and Sound Systems claims that it paid its employees at or above the applicable prevailing rates.

When Sound Systems began work on the Project, it was signatory to a collective bargaining agreement with International Brotherhood of Electrical Workers ("IBEW") Local 202. The collective bargaining agreement included a scale for apprentice electronic technicians and required Sound Systems to make contributions to the Northern California Sound and Communications Joint Apprenticeship Training Committee ("No. Cal. JATC"). Joint Apprentice Training Committees ("JATCs" or "JACs") are the source of apprentices and provide for their training. The No. Cal. JATC was a state-approved JATC. In May 1988, a few months after Sound Systems began working on the project, IBEW Local 202 withdrew its representation of the electronics technician employees of Sound Systems.

In June of 1988, Sound Systems entered into a new collective bargaining agreement with the National Electronic Systems Technicians Union ("NESTU"). The NESTU agreement covered Sound Systems' electronic technicians and included a scale of wages for apprentices. NESTU was associated with a new JATC, the Electronic and Communications Systems Joint Apprenticeship and Training Committee ("E & C JATC"). The E & C JATC had not yet been approved by the state when Sound Systems began relying on it for apprentices

---

**1.** The detention facility project was a public works project within the meaning of California Labor Code section 1720.

to work on the Project. This is the transgression that created the present litigation. The E & C JATC applied for state approval in August of 1989 and received it in October 1990. The approval was not retroactive.

On March 14, 1989, the IBEW Local 551 filed a complaint against Sound Systems with the Division of Apprenticeship Standards ("DAS") of the California Department of Industrial Relations ("DIR"), an administrative agency, alleging violations of California Labor Code section 1777.5, which concerns apprenticeship programs. Although IBEW Local 551 withdrew its complaint, defendant DAS issued a notice of noncompliance to plaintiffs Dillingham Construction and Sound Systems, and the Division of Labor Standards Enforcement issued a Notice To Withhold. The Notice directed the County of Sonoma to withhold monies from Dillingham based on Sound Systems' violations. The basis for the Notice was that plaintiffs had paid some of their workers less than prevailing wages, in violation of Labor Code section 1771. The amount of money withheld equaled the unpaid wages and penalties for failure to pay such wages.

Plaintiffs do not dispute that Sound Systems paid some of its workers less than the prevailing wages for journeymen, but claim that those workers were apprentices and that Sound Systems was entitled to pay those individuals less than journeyman prevailing wage rates, pursuant to the NESTU collective bargaining agreement.

Defendants' basic argument is that there were no apprentices working for Sound Systems because there were no "apprentices" listed on Sound Systems' payroll worksheets; more importantly, there was no approved JAC from which Sound Systems could hire "apprentices". Since there were no true "apprentices",[2] all employees should have been paid the prevailing wage for journeymen.[3]

California's administrative framework for regulating apprenticeships is complex. Rules and regulations establishing minimum standards of wages, hours, and working conditions for apprentices are created by the California Apprenticeship Council ("CAC") under the authority of California Labor Code section 3071 and promulgated at title 8 of the California Code of Regulations (§§ 200 et seq.) The CAC is located within the DAS. Section 212 of the regulations provides that "[a]pprenticeship programs shall be established by written standards approved by the Chief of DAS" and sets forth a detailed list of program standards that must be covered before the program is approved. Cal.Code Regs. tit. 8, § 212.

The CAC exercises approval authority over apprenticeship programs pursuant to the Fitzgerald Act, 29 U.S.C. § 50 et seq., and its implementing regulations, 29 C.F.R. §§ 29.1–29.13. The federal regulations establish criteria under which the Bureau of Apprenticeship and Training (BAT) of the United States Department of Labor may recognize a State agency as the appropriate agency for registering local apprenticeship programs for federal purposes. 29 C.F.R. § 29.12. The CAC has at all times relevant to this action been formally recognized by the BAT as authorized to register and approve apprenticeship programs pursuant to

2. An apprentice is defined as "a person at least 16 years of age who has entered into a written agreement, in this chapter called an 'apprentice agreement', with an employer or program sponsor. The term of the apprenticeship for each apprenticeable occupation shall be approved by the chief, and in no case shall provide for less than 2,000 hours of reasonably continuous employment for such person and for his or her participation in an approved program of training through employment and through education in related and supplemental subjects." Cal.Lab. Code § 3077 (West 1989).

3. State-recognized apprentices have entered into apprenticeship agreements with JATCs to ensure apprentices proper training. There is no evidence in the record of apprenticeship agreements here, nor evidence that Sound Systems' "apprentices" received any training. See Declaration of M. Arceo at 4: "Installer apprentices receive no formal electronic training and engage in cable pulling tasks such as speaker hanging". Cable pulling is not an apprenticeable trade.

the Fitzgerald Act and its regulations.[4]

Plaintiffs assert that California's prevailing wage and apprenticeship standards are preempted by ERISA and the NLRA. This Court finds that the wage and apprenticeship standards at issue here, and the DAS's enforcement of them, are not preempted by either of these statutes.

## PROCEDURAL POSTURE

■ This Court has jurisdiction under 28 U.S.C. § 1331. Federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983); *citing Ex parte Young*, 209 U.S. 123, 160–62, 28 S.Ct. 441, 454–55, 52 L.Ed. 714 (1908); *see also Hydrostorage Inc. v. Northern California Boilermakers*, 891 F.2d 719, 724–25 (9th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 72, 112 L.Ed.2d 46 (1990).

The issue before the Court is the requirement that public works contractors who use apprentices use only those from state approved apprenticeship programs. The legality or illegality of the approval requirement in the face of the preemption arguments is dispositive.

Although the parties disagree as to whether or not plaintiffs employed "apprentices," they do agree that plaintiffs did not employ apprentices from a State approved program. There being no material facts in dispute, summary judgment is appropriate. Fed.R.Civ.P. 56(c).

## ANALYSIS

Plaintiffs base their motion for summary judgment on two theories: 1) apprenticeship standards constitute an employee welfare benefit plan; as such, state laws regulating such standards are preempted by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1381 ("ERISA"); and 2) state mandated prevailing wage rates in excess of collectively bargained-for wage rates are not true minimums and, therefore, are preempted by the National Labor Relations Act, 29 U.S.C. § 151 et seq. ("NLRA").

### A. *ERISA Preemption*

Plaintiffs present a rather simple syllogism in support of their ERISA preemption argument: 1) ERISA preempts all state laws relating to employee welfare benefit plans; 2) California's apprenticeship standards are employee welfare benefit plans; and 3) ERISA, therefore, preempts California laws relating to apprenticeship standards. In support of this argument, plaintiffs cite *Hydrostorage, Inc. v. Northern California Boilermakers*, 891 F.2d 719 at 728. The Court finds that *Hydrostorage* settles the two premises of this analysis, but does not dictate the proffered conclusion.

The plaintiff in *Hydrostorage* was awarded a public works contract to construct a water storage tank for a county water district. Plaintiff neither applied to the relevant Joint Apprenticeship Committee (JAC) for certificate of approval *nor employed any apprentices on the project. Hydrostorage*, 891 F.2d at 722–23. Investigating a complaint, the Director determined that a violation had occurred. The determination was appealed to, and affirmed by, the CAC, which agreed that plaintiff had violated section 1777.5.

According to Cal.Lab.Code section 1777.5, California contractors working on public works contracts, with certain exceptions not relevant here, must:

(1) "apply to the joint apprenticeship committee administering the apprenticeship standards of the craft or trade in the area of the site of the public work for a certificate approving the contractor or subcontractor under the apprenticeship standards for the employment and training of apprentices in the area or industry affected"; (2) employ apprentices in a ratio of no less than one apprentice for every five journeymen; and (3) contribute to the fund or funds in each craft or trade in which [the contractor] employs

---

**4.** The federal regulations also provide for the BAT directly to register apprenticeship programs as conforming with federal standards for federal purposes. 29 C.F.R. § 29.3.

journeymen or apprentices on the public work. . . .

*Hydrostorage*, 891 F.2d at 722, *citing* Cal. Lab.Code § 1777.5. Hydrostorage violated section 1777.5 by failing to apply for a certificate of approval, *failing to employ apprentices*, and failing to contribute to the appropriate fund. *Hydrostorage*, 891 F.2d at 722–23. The DAS, as affirmed by the CAC, issued an administrative order barring Hydrostorage from future public works contracts. The district court found enforcement of the order preempted by ERISA. The Ninth Circuit affirmed.

The Ninth Circuit's three-part analysis of ERISA preemption in *Hydrostorage* is instructive. That court considered: (1) whether the standards at issue fell within ERISA's regulatory scope; (2) whether ERISA's preemption clause reached state laws relating to the same standards; and (3) whether ERISA's savings clause for federal laws saved the standards from ERISA preemption.

### 1. ERISA Employee Welfare Benefit Plans

■ In *Hydrostorage*, the Ninth Circuit first considered whether the CAC-approved apprenticeship standards established by the Northern California Boilermakers' JAC constituted an ERISA "employee welfare benefit plan." 891 F.2d at 728. The JAC's standards consisted of the minimum qualifications for apprentices, the maximum ratio of apprentices to journeymen, the terms and conditions of apprenticeships and the hours and wages of apprentices. *Id.,* at 728. The court found that, because ERISA expressly defines "employee welfare benefit plan" to include apprenticeship and training programs established by "an employer or . . . employee organization, or . . . both," 29 U.S.C. § 1002(1),[5] the JAC's stan-

dards constituted an ERISA employee welfare benefit plan. *Hydrostorage*, 891 F.2d at 728.

The *Hydrostorage* analysis is relevant here because the program that Sound Systems purported to establish was an "apprenticeship or other training program" within the meaning of 29 U.S.C. section 1002(1).

### 2. ERISA's Preemption Clause

Second, the Ninth Circuit in *Hydrostorage* addressed whether or not the administrative order fell within ERISA's preemption clause. *Id.* at 729. ERISA's preemption clause provides:

> [T]he provisions of this subchapter . . . shall supersede any and all *State laws* insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (emphasis added). Holding that the administrative order fell within ERISA's definition of "State laws,"[6] the court further found that it "relates to" an ERISA employee benefit plan. *Hydrostorage*, 891 F.2d at 729–30. A state law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987), *citing Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–900, 77 L.Ed.2d 490 (1983).

In addition to requiring that an administrative order be a "state law" that "related to" an ERISA plan, the court said that the order must also "purport to regulate" directly or indirectly an ERISA plan before it is preempted. *Id.* at 729. A state law

---

**5.** Section 1002(1) defines an ERISA employee welfare benefit plan as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care

or benefits, . . . or vacation benefits, *apprenticeship* or other training programs. . . ." *Id.* (emphasis added).

**6.** State means "a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans . . ." 29 U.S.C. § 1144(c)(2).

"purports to regulate" a plan if it "attempts to reach in one way or another the terms and conditions of employee benefit plans." *Id.* at 729, *quoting Local Union 598 v. J.A. Jones Constr. Co.*, 846 F.2d 1213, 1218 (9th Cir.) *aff'd*, 488 U.S. 881, 109 S.Ct. 210, 102 L.Ed.2d 202 (1988). The *Hydrostorage* court held that the DAS order and § 1777.5, the underlying statute upon which it was based, were "specifically designed to affect employee benefit plans." *Hydrostorage*, 891 F.2d at 730. While the court held that the administrative order fell within ERISA's preemption clause, *id.*, it did not extend its analysis to section 1777.5 itself. *Id.*, at 732.

■ Here, California's approval scheme for apprenticeship programs lies within the reach of ERISA's preemption clause. State approval is required so that plaintiff will be bound by the State's apprenticeship standards *vis-a-vis* an approved JAC; therefore, the approval requirement appears to "relate to" an ERISA plan. Furthermore, the State's approval requirement "purports to regulate" an ERISA plan by requiring review of the terms and conditions of apprenticeship standards. ERISA, however, "does not regulate the substantive content of welfare-benefit plans." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985).

### 3. ERISA's Savings Clause

■ As a third and final step in its analysis, the Ninth Circuit in *Hydrostorage* considered the State's contention that, even if the programs at issue fell within the broad language of ERISA's preemption provision, ERISA's savings clause protected it from preemption. ERISA's saving clause provides that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under such law." 29 U.S.C. § 1144(d).

Congress has spoken to the relationship between the states and apprenticeship standards in the Fitzgerald Act:

The Secretary of Labor is authorized and directed to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, ... to bring together employers and labor for the formulation of apprenticeship, *to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship....*

29 U.S.C. § 50 (emphasis added).

The federal regulations promulgated under the Fitzgerald Act are set forth at 29 C.F.R. §§ 29.1–29.13. Those regulations provide "a detailed regulatory scheme defining apprenticeship programs and their requirements, and establish a review, approval, and registration process for proposed apprenticeship programs administered by State Apprenticeship Councils under the aegis of the United States Department of Labor." *Siuslaw Concrete Constr. Co. v. Washington Dep't of Transp.*, 784 F.2d 952, 956 (9th Cir.1986).

In *Hydrostorage*, the Ninth Circuit rejected the State's argument that ERISA's "savings clause," through the Fitzgerald Act, saved from preemption its requirement that public works contractors hire apprentices and perform all the attendant responsibilities. *Hydrostorage*, 891 F.2d at 731–32. The court adopted the district court's conclusion that "by no stretch of the imagination could § 1777.5 be considered a state law the preemption of which would impair federal law:"

The implementing regulations [of the Fitzgerald Act] state that their purpose is "to set forth labor standards to safeguard the welfare of apprentices, and to extend the application of such standards by prescribing policies and procedures concerned with the registration, for certain Federal purposes, [of] acceptable apprenticeship programs. 29 C.F.R. § 29.-1(b). Thus the regulations relate only to eligibility for federal registration. Neither [the regulations] nor the Act itself contemplate enforcement mechanisms.... Assuming § 1777.5 was adopted in furtherance of the objectives of the Fitzgerald Act, it clearly is not an

enforcement mechanism of federal law and to the extent orders under this section are preempted by ERISA, federal law is not impaired.

*Hydrostorage, Inc. v. Northern California Boilermakers,* 685 F.Supp. 718 at 722 (N.D.Cal.1988). The Fitzgerald Act neither "articulate[s] a 'goal of encouraging joint state/federal enforcement'" nor "contain[s] a clause which preserves state laws." *Hydrostorage,* 891 F.2d at 732.

The Ninth Circuit recently clarified the extent to which ERISA's savings clause protects from preemption state laws regulating apprenticeships in *Electrical Joint Apprenticeship Committee, et al. v. MacDonald,* 949 F.2d 270 (9th Cir.1991). There, the court considered the State of Nevada's enforcement of its prevailing wage statute governing state public works projects, which exempts apprentice programs approved by the Nevada State Apprenticeship Council (SAC), but does not exempt programs already approved directly by the federal BAT. Though the Court found the state's effort to subject BAT-approved apprenticeship programs to state SAC approval requirements preempted by ERISA, its opinion makes clear that, notwithstanding the sweeping language of *Hydrostorage,* the states can continue to exercise roles in apprenticeship regulation that are not preempted by ERISA.

The court in *MacDonald* found that ERISA's savings clause saves from preemption the Fitzgerald Act, and further explained that

> [t]here is no exemption from the broad preemption provision of section 514(a) of ERISA *except for* the federal Fitzgerald Act and the regulations issued thereunder ... Thus, any state regulation of apprenticeship programs that is separate and apart from the authorization given by the Fitzgerald Act and its accompanying regulations is preempted by section 514(a) of ERISA.

*Id.* at 274 (emphasis added). The court also made clear that both the BAT and the federally-authorized state agencies exercise non-preempted approval functions under the Fitzgerald Act and its regulations:

29 C.F.R. § 29.3 provides for a dual system of approval and recognition so that either the BAT or the State Apprenticeship Council can approve an apprenticeship program for federal purposes. However, either agency is constrained in its approval to apply the requirements and standards of the federal regulations. *Id.* at 273. Because the BAT had already authorized the apprenticeship program at issue, yet the SAC asserted jurisdiction over and withheld approval of the same program pursuant to its own statutes and regulations, the state was, in essence, stepping outside the Fitgerald Act spotlight into the pervasive darkness of ERISA preemption. *Id.* at 274–75.

Here, we are not concerned only with the state's effort to force a public works contractor to establish an ERISA plan, as in *Hydrostorage,* or with a conflict between federal and state approvals, as in *MacDonald.* We are concerned with a state's right to require employers who wish to pay employees apprentice wages, thereby benefiting from a limited exemption from the state's hour-and-wage laws, to obtain prior state approval of their apprenticeship programs.

The State approval requirement insures the integrity of apprenticeship programs and protects the public and would-be apprentices from fraudulent programs which result in inadequately-trained or abandoned apprentices. The Court finds that this purpose falls squarely within the state's delegated jurisdiction under the Fitzgerald Act as articulated in the Fitzgerald Act itself and in its regulations:

> The purpose of this part is to set forth labor standards to safeguard the welfare of apprentices, and to extend the application of such standards by prescribing policies and procedures concerning the registration, for certain Federal purposes, of acceptable apprenticeship programs with the U.S. Department of Labor.... These labor standards, policies and procedures cover the registration, cancellation and deregistration of apprenticeship programs and of apprenticeship agreements; the recognition of a State

agency as the appropriate agency for registering local apprenticeship programs for certain Federal purposes; and matters relating thereto.

29 C.F.R. § 29.1. Preemption of the state approval requirement would unquestionably impair the purposes of the Fitzgerald Act and its regulations within the meaning of ERISA's savings clause.[7] Therefore, the state approval requirement is saved from preemption.[8]

California's authority to establish and enforce minimum apprenticeship standards is, for these reasons, saved from ERISA preemption.

#### B. *NLRA Preemption*

■ Defendants withheld monies from plaintiff Dillingham on the basis that plaintiff Sound Systems paid less than prevailing wage to some of its employees. Those prevailing wage rates are above the rates set for apprentices in the NESTU collective bargaining agreement, to which Sound Systems is a party. Plaintiffs contend that defendants are preempted by the National Labor Relations Act from enforcing the prevailing wage rates, because the rates interfere with the collective bargaining process. Defendants, on the other hand, assert that the prevailing wage issue is linked to the apprenticeship approval requirement. The requirement incorporates minimum labor standards and is therefore not preempted by the NLRA. For the reasons set forth below, the Court finds that the

State's minimum apprenticeship labor standards are not preempted by the NLRA.

Unlike ERISA, the NLRA contains no statutory preemption provision. *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985). Notwithstanding the NLRA, "[s]tates possess broad authority under their police powers to regulate the employment relationship within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety ... are only a few examples." *Id.* at 756, 105 S.Ct. at 2398, *quoting De Canas v. Bica,* 424 U.S. 351, 356, 96 S.Ct. 933, 937, 47 L.Ed.2d 43 (1976). *Cf. Siuslaw Concrete Constr. Co. v. Washington Dep't of Transp.,* 784 F.2d 952, 958 (9th Cir.1986) (upholding state law mandating higher minimum wage rates for trainees than provided under federal law: "[t]he Washington statute is a minimum wage law enacted by the State as an exercise of its police power.")

The Supreme Court, however, has articulated two distinct NLRA preemption principles. *Metropolitan Life,* 471 U.S. at 748, 105 S.Ct. at 2393. First, there is the so-called *Garmon* rule, which "protects the primary jurisdiction of the NLRB [National Labor Relations Board] to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA." 471 U.S. at 748, 105 S.Ct. at 2394, *citing San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d

7. In addition, several other laws of the United States acknowledge and accommodate the validity of State apprenticeship standards. *See* 42 U.S.C. § 12571 (National and Community Service Act of 1990, limiting the use of certain benefits to those covering "expenses incurred in the full-time participation in an apprenticeship program approved by the appropriate State agency"); 20 U.S.C. § 2331, 2382 and 2471 (state apprenticeship programs and vocational education); 23 U.S.C. § 140(a) (state apprenticeship programs and federal highways); 38 U.S.C. § 1787(a)(1) (state apprenticeship programs and veterans). Because it finds that the Fitzgerald Act saves the state approval requirement from preemption, the Court does not reach whether ERISA preemption would impair any of these other laws.

8. Supplemental authority submitted by the plaintiffs is distinguishable from the instant case, because, *inter alia,* those courts never reached a savings clause analysis. *See, e.g., Boise Cascade Corp. v. Peterson,* 939 F.2d 632 (8th Cir.1991) (reversing district court finding that apprenticeship ratio regulations did not constitute an ERISA benefit plan); *Carpenters S. California Admin. Corp. v. El Capitan Dev. Co.,* 53 Cal.3d 1041, 282 Cal.Rptr. 277, 811 P.2d 296 (1991) (holding preempted a statute which created liens on real property for the benefit of collectively bargained trust funds); *Associated Builders and Contractors v. Baca,* 769 F.Supp. 1537 (N.D.Cal.1991) (finding preemption of local ordinances regarding per diem wages on private works).

775 (1959). The second is the *Machinists* principle, which

> protects against state interference with policies implicated by the structure of the [NLRA] itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated. The doctrine was designed, at least initially, to govern pre-emption questions that arose concerning activity that was neither arguably protected against employer interference [citation], nor arguably prohibited as an unfair labor practice [citation]. Such action falls outside the reach of *Garmon* pre-emption.

471 U.S. at 749, 105 S.Ct. at 2394, *citing International Ass'n of Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *see also New York Tel. Co. v. New York State Dept. of Labor*, 440 U.S. 519, 529–531, 99 S.Ct. 1328, 1335–36, 59 L.Ed.2d 553 (1979). Neither of the two theories preempt the State from establishing and enforcing minimum apprenticeship standards.

Plaintiffs claim that *Garmon* preemption is present here because workers' wage rates are governed by the collective bargaining process and protected by section 7 of the NLRA. Section 7 of the NLRA provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employ-

ment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157. *Garmon* held that:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the [NLRA] ... due regard for the federal enactment requires that state jurisdiction must yield.

*Garmon*, 359 U.S. at 244, 79 S.Ct. at 779.[9]

The key to plaintiffs' NLRA preemption argument is not *Garmon* itself, but a Ninth Circuit decision applying *Garmon: Bechtel Constr., Inc. v. United Bhd. of Carpenters*, 812 F.2d 1220, 1225 (9th Cir. 1987). *Bechtel*, however, is distinguishable.

In *Bechtel*, the Bechtel Construction Company contracted to provide construction maintenance at the San Onofre Nuclear Generating Station (apparently a private works project). Bechtel was signatory to a national agreement between the General Presidents Committee ("GPC") and various maintenance contractors. The agreement was known as the "GPPM agreement" and applied to the San Onofre project. The GPPM agreement did not discuss wage rates or terms of employment for apprentices, yet the San Onofre project employed apprentices.

The San Onofre apprentices were to be trained by the contractor pursuant to an Apprenticeship Agreement. Bechtel and the local JAC signed the Apprenticeship Agreement, which was then approved by the Division of Apprenticeship Standards ("DAS"). The agreement incorporated "all Apprenticeship Standards of the Division, *including wage rates*." *Bechtel*, 812 F.2d at 1221 (emphasis added).

During the performance of the contract, Bechtel announced that it sought a wage reduction at San Onofre. Without seeking to modify the Apprenticeship Agreement, Bechtel received approval for its proposed

---

**9.** In *Garmon*, the NLRB had declined to exercise jurisdiction over the dispute in question, after which the state courts had assumed jurisdiction. The Supreme Court held that the "refusal of the [NLRB] to assert jurisdiction did not leave with the States power over activities they otherwise would be pre-empted from regu-

lating," 359 U.S. at 238, 79 S.Ct. at 776, so that the state courts' assumption of jurisdiction was improper. As the Supreme Court explained in *Metropolitan Life*, the purpose of the *Garmon* rule is to protect the primary jurisdiction of the NLRB. *Metropolitan Life*, 471 U.S. at 748, 105 S.Ct. at 2393.

reduction from the GPC and, thereafter, reduced all wage rates—including the apprentices'. Several apprentices filed complaints with the Division of Labor Standards Enforcement ("DLSE") seeking due and unpaid wages. In response, Bechtel filed an action in the district court seeking declaratory and injunctive relief. The district court found, and the Ninth Circuit affirmed, that "under California law, state minimum wage standards for apprentices do not apply where there is a collective bargaining agreement...." *Id.* at 1222.

The Ninth Circuit's opinion addressed, first, whether California's apprenticeship *wage* standards were legal minimums, *id.* at 1222–25, and second, the NLRA's preemptive effect on state agencies attempting to enforce apprenticeship standards. *Id.* at 1225–26.

In the first part of its opinion, the court held that the apprentice wage standards were not legal floors and the State had no jurisdiction over claims for unpaid wages arising under collective bargaining agreements. *Id.* at 1223–24. The court carefully distinguished the issue before it from the "legal minimum" exception to NLRA preemption articulated in *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), wherein the Court held that "[w]hen a state law establishes a minimal employment standard not inconsistent with the federal legislative goals of the NLRA, it conflicts with none of the purposes of the Act." *Id.* at 757, 105 S.Ct. at 2398.[10]

The apprenticeship wage standards in *Bechtel* were not true legal minimums in the *Metropolitan Life* sense, because "California law places the collective bargaining agreement over the Approved Standards for Apprentices in *setting wages for apprentices....*" 812 F.2d at 1225 (emphasis added). According to the *Bechtel* court, California's regulations and statutes suggest that "wage progression schedules" or "wage scales" should be in accordance with and secondary to collective bargaining agreements. *Id.* at 1222.

Plaintiffs have read the *Bechtel* holding to say that "prevailing wage rates are secondary to collectively-bargained wage rates." Plaintiffs then claim that, since prevailing wage rates are not true minimums, defendants may not force them to pay anything over the NESTU collectively bargained-for apprentice wage rate. According to plaintiffs, because prevailing wage rates are not *Metropolitan Life* legal minimums, they are preempted by the NLRA. *Bechtel*, however, does not address "prevailing wage rates."

More important, the "true legal minimum" at issue in the present case is not the NESTU apprentice *wage* standard, but apprentice *qualification* standards; *i.e.*, whether the apprenticeship program includes appropriate levels of education, training, and supervision.[11] The State simply seeks to enforce its requirement that public works contractors employing apprentices employ only state-approved apprentices. Ordained/approved apprentices are those who participate in state approved programs, *i.e.*, programs that guarantee training in exchange for lower wages. DAS does *not* claim that the NESTU wage scale is too low, or that anyone who was in the legal category of apprentice be paid a higher proportion of pay in relation to the journeymen as was the case in *Bechtel*. Rather, DAS asserts that because plaintiffs do not employ "apprentices," they must pay prevailing wages. If Sound Systems had properly hired apprentices from a program approved by the state, in a craft recognized as "apprenticeable" under prevailing wage law, it could have paid them according to any legal collective bargaining agreement in effect.

Wage rates are at issue only because the State requires plaintiffs to pay journey-

---

**10.** *Metropolitan Life* involved a Massachusetts statute requiring specified minimum mental health care benefits for Massachusetts employees. The Court held that this was a minimal employment standard and not preempted by the NLRA.

**11.** Contrast *Associated Builders and Contractors v. Baca*, 769 F.Supp. 1537, in which certain localities offered a choice between paying certain per diem wages and posting a completion bond, thereby undercutting the stated objective of public safety.

men's prevailing wage rates to non-indentured apprentices. Plaintiffs have to pay prevailing wages because that is what they contracted to do, as they have conceded.[12]

The issue before this Court is the State's authority to require apprenticeship program approval, not the State's authority to preempt the collective bargaining process when it comes time to adjust apprentices' wage standards—the claimed authority which was struck down in *Bechtel.*

In the second part of *Bechtel,* the court observed that the *Garmon* rule prohibits the state from regulating any activity that the NLRA protects, prohibits or arguably protects or prohibits, and held that section 7 of the NLRA "preempt[s] any attempt to enforce the Approved Standards against collectively bargained-for wage rates." 812 F.2d at 1225. The court rejected the JAC's argument that the wage standards established a minimum employment standard within the meaning of *Metropolitan Life,* finding that they were not true minimums because they could be undercut through negotiations approved by the DAS. "A 'minimum' by definition cannot be undercut. *Metropolitan Life* concerned state legislation establishing true minimum labor standards as an exercise of the state's police power." *Bechtel,* 812 F.2d at 1225–26.

The plaintiffs here argue that, under *Bechtel,* the State's prevailing wage law does not establish true minimums because, the approval of an apprenticeship program authorizes lower wage levels. This argument misses the mark, because the minimums at issue here relate to appropriate education and training in apprenticeship programs. Nothing in California's statutory scheme indicates that those standards may be undercut:

> Nothing in this chapter or in any apprentice agreement approved under this chapter shall operate to invalidate any apprenticeship provision in any collective agreement between employers and em-

ployees setting up *higher* apprenticeship standards.

Cal.Labor Code § 3086 (emphasis added). The California Apprenticeship Council shall issue rules and regulations which establish standards for minimum wages, maximum hours, and working conditions for apprentice agreements, ... referred to as apprenticeship standards, which *in no case shall be lower* than those prescribed by this chapter....

Cal.Lab.Code § 3071 (emphasis added). California's apprenticeship standards requiring education and training are true minimums that may not be undercut; therefore, they are true minimum employment standards not preempted by the NLRA.

Minimum employment standards have virtually no effect on the collective bargaining process, and only an indirect effect on the right of self-organization established in section 7 of the NLRA. *Metropolitan Life,* 471 U.S. at 755, 105 S.Ct. at 2397.

> Unlike the NLRA, mandated-benefit laws are not laws designed to encourage or discourage employees in the promotion of their interests collectively; rather, they are in part "designed to give specific minimum protection to *individual* workers and to ensure that *each* employee covered by the Act would receive" the mandated [minimum protection].

*Id., quoting Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 739, 101 S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981). Section 7 of the NLRA does not preempt California from establishing or enforcing its minimum apprenticeship standards.

Nor are minimum apprenticeship standards preempted by the *Machinists* principle. *International Ass'n of Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Under *Machinists* preemption, the Court must consider whether Congress purposely left open the opportu-

---

12. As previously noted, "Sound Systems requested a determination by the County of Sonoma regarding the appropriate prevailing rates applicable to all work performed on the Detention Facility project." After receiving the figures, Sound Systems claims to have paid its employees on the Project at or above the prevailing wage levels quoted by the County.

nity for the states to establish minimum apprenticeship standards by not legislating in that area. *See New York Tel. Co. v. New York State Dept. of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). Where the preemptive effect of federal enactments is not explicit,

> courts sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.'

*Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 209, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985), *quoting Malone v. White Motor*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978).

Congress has not attempted to occupy the field of apprenticeship standards. The Fitzgerald Act expressly contemplates states creating their own standards. *Siuslaw Concrete Constr. Co. v. Washington Dep't of Transp.*, 784 F.2d 952, 955–58 (9th Cir.1986). *See also* 42 U.S.C. § 12576 (State apprenticeship programs and the National and Community Service Act); 20 U.S.C. § 2331, 2382 and 2471 (State apprenticeship programs and vocational education); 23 U.S.C. § 140(a) (State apprenticeship programs and federal highways); 38 U.S.C. § 1787(a)(1) (State apprenticeship programs and veterans). The Court therefore concludes that *Machinists* preemption does not apply.

Plaintiffs have also asserted a civil rights claim pursuant to 42 U.S.C. section 1983. At the hearing on December 12, 1990, the Court granted plaintiffs' motion to amend the complaint to attempt to state a cognizable section 1983 claim.

Plaintiffs base their claim on alleged infringement of their right to collectively bargain under the NLRA. The section 1983 argument, however, is contingent upon defendants' being preempted by the NLRA from enforcing the State's minimum apprenticeship standards. The Court finds no violation of plaintiffs' rights under the NLRA; therefore, the section 1983 claim fails.

## CONCLUSION

The State has the right to establish and enforce its own minimum apprenticeship standards. That right is not preempted by either ERISA or the NLRA. One of the mechanisms for enforcing the standards is to require that apprenticeship programs receive approval from the state before apprentices may be hired on public works projects. Only then can the workers truly be classified as apprentices. Once classified as apprentices, the State permits employers to pay them lower than prevailing wage rates, assured that, in exchange for lower wages, the apprentices are receiving appropriate training and education. Plaintiffs did not hire from an approved apprenticeship program during the period at issue here; therefore, the State did not have those assurances and properly found a violation of section 1771.

The state approval requirement is essential to the State's effective enforcement of its prevailing wage law. The power to establish and enforce minimum employment standards fall squarely within the State's legitimate exercise of its police power. If the State were not able to require that apprenticeship programs be approved before employers may pay workers less than prevailing wages, then the apprenticeship system would become a wide-open loophole through which employers could hire and underpay workers on state public works contracts without offering them the legitimate benefits of apprenticeship status. It is inconceivable that either ERISA or the NLRA could be logically intended or construed to dictate this result.

For all the reasons stated herein, plaintiffs' motion for summary judgment is DENIED. Defendants' motions for summary judgment are GRANTED. The Court need not reach defendant County of Sonoma's motion to dismiss.

SO ORDERED.