[No. B065537. Second Dist., Div. Two. June 13, 1994.]

THE PEOPLE, Plaintiff and Appellant, v.
THOMAS INCHO HWANG et al., Defendants and Respondents.

## COUNSEL

Ira Reiner, District Attorney, Harry B. Sondheim and Shirley S. N. Sun, Deputy District Attorneys, for Plaintiff and Appellant.

Richard E. Nahigian and Michael R. Totaro, under appointments by the Court of Appeal, for Defendants and Respondents.

## OPINION

**BOREN, P. J.**—Respondents Thomas Incho Hwang and Chung Chon Chang were held to answer by a magistrate for unlawfully taking a portion of a workman's wages, a felony. (Lab. Code, § 1778.)[1] The superior court subsequently set aside the information and dismissed the case. (Pen. Code, § 995.) The People have appealed the order setting aside the information.

There is probable cause to believe respondents deliberately paid their employees far less than the prevailing wage required by law and by their agreement with the contracting public entity. Respondents' failure to pay employees their legal wages, plus the suspicious circumstances surrounding their payment of the wages, leads to the reasonable inference that respondents took or conspired to take a portion of their workers' wages. Therefore, respondents were properly held to answer for the section 1778 felony, and the order setting aside the information must be reversed.

### FACTS[2]

Respondent Thomas Incho Hwang is the owner of Lucky Construction Company (Lucky). Lucky was the successful bidder on 10 public works projects.[3] Respondent Chung Chon Chang is the manager/superintendent of Lucky, and makes hiring decisions and supervises some of the work. All of Lucky's workers, except day laborers, were hired by respondents.

---

[1] All future statutory references are to the Labor Code, unless otherwise indicated.

[2] The facts are those stated in the preliminary hearing transcript.

[3] The 10 projects are: Buchanan Elementary School; Eastman Avenue Elementary School; Castellar Elementary School; San Fernando Recreation Center; State Street Recreation

The Labor Code requires that public works project employees be paid "the general prevailing rate of per diem wages." (§ 1771.) The prevailing wage rate is determined by the Director of the Department of Industrial Relations. (§ 1770.) Lucky's contracts with the Los Angeles Unified School District and other government entities specify that the prevailing wage must be paid and certified payroll records kept. They also specify that workers must be on the job for eight hours per day.

The evidence showed that Lucky's employees were not paid the legally specified prevailing wage. In fact, these workers were paid considerably less than the prevailing wage.[4] Respondent Hwang takes issue with the accounting methods used by state investigators, but does not refute the testimony showing that Lucky paid less than the prevailing wage.

The testimony revealed that there were unusual circumstances surrounding the payment of wages to the construction workers at Lucky's worksites.

Wilfredo Nunez, for instance, was directed to tell state inspectors that he was paid $20 per hour and also to hide in the toolshed when inspectors came to the worksite. On one occasion, a check was passed to him by a job superintendent, face side down, so he could not see the amount, and he was told to endorse it. He was then handed a cash payment. Nunez saw a coworker paid in a similar fashion.

Marco Ochoa was hired by respondent Hwang as a painter. He informed Hwang that he is not a licensed contractor. Hwang had Ochoa recruit workers to help with the painting. Respondent Chang instructed Ochoa to have the workers tell people they were earning the prevailing rate, which was far more than the $60 per day these workers were paid. While Ochoa paid the workers the $60 daily rate that was promised, the checks he received from Lucky did not cover materials, so he had to use part of his paycheck and his coworkers' paychecks to buy the necessary materials. Ochoa was unhappy with this payment arrangement, and quit after one week though he had planned to work five or six weeks on the project. Ochoa denied "taking money" from the workers. Before receiving a paycheck, he

---

Center; Rancho Cucamonga Corporate Yard; Wilshire Crest Elementary School; Eagle Rock Elementary School; Alta Loma Elementary School; and Breed Street Elementary School.

[4]Myung Suk Kang and Joon Young Kim, a laborer and an equipment operator, were each paid a wage of $10 per hour when the prevailing wage for their jobs was $20 per hour. Young Sam Kim and Yong J. Hyun, both carpenters, were paid $15 per hour in lieu of the prevailing rate of $26 per hour. Carpenters' helpers Wilfredo Nunez and Bok Chung Kim received hourly wages of $5 and $8.25, respectively, when the prevailing wage was $24 per hour. Painters Ricardo Estrada and Carlos Emilio Juarez did not receive the prevailing hourly rate of $26 for their work, but were paid $4.15 and $6.25, respectively.

had to sign, at Hwang's insistence, a time sheet showing he earned the prevailing rate.

When Ricardo Estrada first arrived at a Lucky worksite, respondent Chang told him he was going to earn $26 per hour, and that if he was asked, he should tell people he was earning that amount. Respondent Hwang's wife passed Estrada a check to endorse, facedown, but he saw that the amount of the check was for approximately $900. Estrada was then given $300 cash by Marco Ochoa, who recruited him to work at the Lucky project. When he asked for the rest of the money he was supposed to make, at a rate of $26 per hour, Ochoa replied that $300 was all Estrada was going to get. Ochoa drove with Estrada to a bank and deposited the check. Estrada saw a coworker being paid in a similar manner. On another occasion, Estrada was told to sign several checks made out in his name. He was not given any money from these checks, and was told that the money would be used to purchase materials.

Carlos Juarez, a painter, was asked by Marco Ochoa to work at Lucky's public worksites. As with Estrada, Ochoa had Juarez endorse checks, then gave him only a portion of the face amount, saying that the rest would be used to buy materials. When Juarez refused to go along with this, after signing three such checks, Ochoa said "that the Koreans said that I could no longer work," and he was fired.

Inspectors discovered that workers who had Hispanic surnames, all of whom worked eight hours per day, were listed in Lucky's project diaries, but not in its certified payroll records. They were paid out of "petty cash."

Bok Chung Kim was hired by respondent Chang as a carpenter's helper. Chang told him he would be paid $330 per week. When Kim signed time sheets at Lucky's on-site office, he observed that his time sheets stated he was being paid $24 per hour, but he was not in fact ever paid that amount. One weekly time sheet shows Kim worked three days, but Kim wrote on it, in Korean, "I worked 5 days." Another time sheet shows Kim worked two days, but he wrote on it, "I worked 4 days." He complained to Chang about the erroneous time sheets he was made to sign.

Joon Young Kim was paid $80 per day to operate equipment, though he learned from other workers that he was supposed to be paid an hourly rate of $20 for working from 7 in the morning until 3:30 in the afternoon. According to his affidavit, Kim once falsely told a state inspector that he was receiving the prevailing wage in order to keep his job.

Laborer Myung Suk Kang was hired by respondent Chang to work for $80 per day, for an eight-hour workday. He was paid straight time even when

working on weekends. Chang instructed Kang to tell any investigators or inspectors that he was earning union wages. Once, when an inspector approached him, he said he was receiving the prevailing wage because Chang told him to do so, and Chang was listening at the time. Later, when Chang was not present, Kang apologized to the inspector for not telling the truth and informed her he was in fact making less than the prevailing rate. Before receiving his weekly paycheck, Kang was required to sign a time sheet. These time sheets showed fewer hours than he had actually worked.

Young Sam Kim, a carpenter, was paid $120 per day, for eight hours a day, five or six days per week. He saw that the time sheets he had to sign did not accurately reflect the number of hours he worked. A Lucky superintendent told him he would not get paid if he did not sign the falsified time sheet, so he signed it. In the case of carpenter Yong J. Hyun, who objected to signing the falsified time sheet, respondent Chang told him to sign it or be fired. Chang also instructed Hyun to lie about his pay rate if asked how much he earned. Later, Hyun refused to sign a time sheet and was told to leave.

An on-site supervisor, Grant Kyusok Choe, wrote down the hours each employee worked but deliberately did not report all of those hours on the employees' time sheets. "Adjusting" the number of reported work hours was company policy as explained to him by his supervisors, Hwang and Chang. Another of Lucky's managers, Mun Sung Cho, also noticed that there was a discrepancy between the workers' hours he reported to Lucky and the number of hours appearing on the time sheets the employees signed. Lucky superintendent Chung Soo Kim agreed that he would write down that a worker had labored for four hours when in fact the worker had put in eight hours on the job. This was company policy. Some workers complained to him about their pay. Superintendent Heyong Suk Kim testified that he instructed workers to tell anyone who asked that they were being paid the prevailing rate.

An audit performed by government inspectors revealed that Lucky had underreported its manpower, and owed substantial back wages to its employees, plus penalties. The inspectors determined that the certified payroll records submitted by respondent Hwang had been falsified. The information used by the government inspectors came from Lucky's books as well as employee interviews.

In the information, respondents were charged with 10 counts of receiving a portion of the wages of a worker, a felony. (§ 1778.) Enhancements were specially alleged as to all but count one, based on the amount of the illegal

taking. (Pen. Code, § 12022.6.) Following a 12-day preliminary hearing, respondents were held to answer by the magistrate on all 10 violations of section 1778.

In the superior court, respondent Hwang moved for a dismissal pursuant to Penal Code section 995. Respondent successfully argued that there was no evidence that a portion of any workman's wages was taken, and the trial court granted the motion and dismissed the case. The People filed this appeal on November 25, 1991.

DISCUSSION

1. *Standard of Review*

Penal Code section 995 allows a defendant to make a motion to set aside an information on the grounds that he was committed without reasonable or probable cause. In appeals from proceedings under Penal Code section 995, the magistrate's determination in holding the defendant to answer is reviewed; the superior court's ruling is effectively disregarded. (*People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].)

"Our task is to determine whether the magistrate, acting as a person of ordinary prudence, could conscientiously entertain a reasonable suspicion that the defendant committed the crime charged. (*People* v. *Stansbury* (1968) 263 Cal.App.2d 499, 502 [].) To that end, we draw every legitimate inference supported by the competent evidence and refrain from substituting our judgment for that of the magistrate. If the record demonstrates some showing of every element of the charge (*People* v. *Love* (1988) 203 Cal.App.3d 1505, 1507 []), we must affirm the magistrate's ruling denying the motion to set the charge aside." (*People* v. *Alonzo* (1993) 13 Cal.App.4th 535, 538 [16 Cal.Rptr.2d 656].)

2. *Elements of Section 1778 Offense*

Section 1778 states: "Every person, who individually or as a representative of an awarding or public body or officer, or as a contractor or subcontractor doing public work, or agent or officer thereof, who takes, receives or conspires with another to take or receive, for his own use or the use of any other person any portion of the wages of any workman or working subcontractor, in connection with services rendered upon any public work is guilty of a felony."

Thus, if there is some showing in the record that respondents, as public works contractors, took, received or conspired to take the wages of their employees, they may be tried for a felony violation of section 1778.

The sticking point in this case concerns the use of the phrase "wages of any workman" in section 1778. The People argue that the workman's wage is the prevailing wage, as defined by the public works statutes. Respondents, by contrast, argue that the workman's wage, for purposes of section 1778, is not the prevailing wage, but is whatever amount they agreed to pay their workers, even if that wage happens to fall below the prevailing wage.

The meaning of a statute is a question of law, and the reviewing court is not bound by the interpretation of a lower court. When interpreting a statute, a court must " '(1) Ascertain the intent of the Legislature so as to effectuate the purpose of the law. (2) Give a provision a reasonable and common sense interpretation consistent with the apparent purpose, which will result in wise policy rather than mischief or absurdity. (3) Give significance, if possible, to every word or part, and harmonize the parts by considering a particular clause or section in the context of the [statutory framework as a] whole. (4) Take into account matters such as context, object in view, evils to be remedied, legislation on the same subject, public policy, and contemporaneous construction. (5) Give great weight to consistent administrative construction.' " (*Monzon* v. *Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16, 30 [273 Cal.Rptr. 615]; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17-18] [194 Cal.Rptr. 722]; *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323] ["The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible."].)

An examination of the statutory framework reveals that the prevailing wage statutes and the crime charged in this case all fall within the same part, the same chapter, and the same article of the Labor Code.

Within the Labor Code article titled "Wages" (§§ 1770-1781), section 1771 reads, "Except for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter, shall be paid to all workers employed on public works." In the same vein, section 1774 mandates that "The contractor to whom the contract is awarded . . . shall pay not less than the specified prevailing rates of wages to all workmen employed in the execution of the contract." The statutory framework provides a method for determining the general prevailing rate of per diem wages. (§ 1773.)

■ "The overall purpose of the prevailing wage law is to protect and benefit employees on public works projects." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 985 [4 Cal.Rptr.2d 837, 824 P.2d 643].) Prevailing wage legislation is intended to prevent government contractors from using " 'itinerant, cheap, bootleg labor.' " (*Universities Research Assn. v. Coutu* (1981) 450 U.S. 754, 774 [67 L.Ed.2d 662, 677, 101 S.Ct. 1451]; *Independent Roofing Contractors* v. *Department of Industrial Relations* (1994) 23 Cal.App.4th 345, 356 [28 Cal.Rptr.2d 550].)

■▪■ Read as a whole, the statutes and case law make clear that, as far as the government is concerned, the *only legal wage which may be paid to laborers on public works projects is the prevailing wage.* It is of no moment that respondents did not contract with their employees to pay the prevailing wage: the statutory requirement that workers be paid the prevailing wage "is not limited to those workers whose employers have contractually agreed to pay the prevailing wage; it applies to '*all* workers employed on public works.' " (*Lusardi Construction Co.* v. *Aubry, supra,* 1 Cal.4th 976, 987.)

If the only legal wage that may be paid to public works project employees is the prevailing wage, then respondents' payment of only a fraction of the prevailing wage lends itself to the conclusion that respondents took or conspired to take their workers' legal wages. This being the case, respondents may be tried for a violation of section 1778.

Our interpretation of section 1778 is consistent with the statutory purpose of the public works prevailing wage laws. If contractors such as Lucky are permitted to win public works contracts based on their express written agreement to pay workers the prevailing wage, and if they then pay their workers far less than the prevailing wage, the entire statutory scheme would be subverted. Employees would not be protected from substandard wages and the public would not be benefited through the superior efficiency of well-paid employees. (*Lusardi Construction Co.* v. *Aubry, supra,* 1 Cal.4th at p. 987.) Moreover, honest contractors—who base their bids on the prevailing wage rates and legitimately intend to pay those rates—would be punished by losing business to unscrupulous contractors who underbid because they have no intention of paying the prevailing wage.

In this particular instance, the preliminary hearing testimony showed a pattern of conduct designed to deprive Lucky employees of their legal wages. Some workers were made to endorse paychecks, then given much

less than the face amount of the check as their pay.[5] Other workers were required to sign falsified time sheets showing payment of the prevailing wage in order to receive their paychecks. Some who objected to the false check endorsements and false time sheets were terminated from their employment with Lucky. The workers were instructed to lie to state inspectors and tell them they were receiving the prevailing wage, or to hide from the inspectors. At least one worker was told he had to lie about his wage in order to keep his job. Lucky's managers and supervisors did not deny the time sheet falsifications, which they characterized as company policy.

Drawing every legitimate inference that may be drawn from the evidence in favor of the information (*People v. Superior Court (Sims)* (1986) 185 Cal.App.3d 471, 475 [230 Cal.Rptr. 4]), there is sufficient evidence to support the magistrate's ruling, and the information should not have been set aside pursuant to Penal Code section 995.

### 3. *Section 1778 Does Not Conflict With Other Statutes*

■ Respondents argue that other statutes within the same article of the Labor Code address criminal violations of the prevailing wage laws, and are the government's exclusive remedy for such violations. Accordingly, they reason, they cannot be charged with a violation of section 1778.

In addition to section 1778, there are two other statutes directed at punishing Labor Code violations by public works contractors, sections 1775 and 1777. Neither section 1775 nor section 1777 conflicts with section 1778, or prevents the government from filing felony charges against a contractor who fails to pay employees the prevailing wage.

Section 1775 subjects the contractor to a civil penalty of $50 per day, payable to the contracting government entity, for failure to pay the prevailing wage rates. Although the Legislature decided to allow the possibility of imposing a civil penalty on contractors under section 1775, this does not prevent the government from pursuing a criminal prosecution. (*People v. Miles & Sons Trucking Service, Inc.* (1968) 257 Cal.App.2d 697, 706-707 [65 Cal.Rptr. 465]. See Pen. Code, § 9: the imposition of criminal penalties does not affect the right to pursue civil penalties.)

---

[5]Respondents attempt to blame Marco Ochoa for this occurrence. Ochoa denied ever pocketing money owed to Lucky employees. The magistrate apparently chose to believe Ochoa, and that determination will not be reweighed here.

The other statute which criminalizes violations of the wage laws is section 1777.[6] Section 1777 has two facets. First, section 1777 provides that any *government employee* who willfully violates any of the prevailing wage provisions is guilty of a misdemeanor. Second, section 1777 states that any contractor who neglects to maintain accurate, certified payroll records is guilty of a misdemeanor.

Obviously, respondents are not government agents who violated the prevailing wage provisions, so the first prong of section 1777 does not apply to them. As to the second aspect of section 1777, the option of prosecuting a contractor for a failure to maintain adequate records does not negate the option of prosecuting the contractor for taking a portion of a workman's wages, which is a markedly different offense.

It should be noted that former section 1781 once supported the position taken by respondents. It read, "The penalties and remedies provided for in sections 1775 and 1777 shall be the exclusive penalties and remedies against any contractor or subcontractor for any violation of sections 1770 to 1777 [the prevailing wage laws] or of the provisions inserted in any call for bids, specifications or contracts pursuant thereto." Former section 1781 was repealed in 1957. (Stats. 1957, ch. 396, § 1, p. 1240.)

The repeal of former section 1781 suggests that the Legislature intended for section 1778 to provide a penalty or remedy for a contractor's violation of the prevailing wage laws. This much may be inferred from the Legislature's determination that sections 1775 and 1777 would no longer be the exclusive remedy for violations of the prevailing wage laws.

## 4. *Federal Preemption of Prevailing Wage Laws*

Respondents were charged with violating section 1778. The only issues decided by the trial court concerned section 1778. Nevertheless, respondent Hwang argues that this court should consider the constitutionality of section 1775, which imposes a civil penalty for failure to pay the prevailing wage. He argues that section 1775—and the entire prevailing wage scheme—impermissibly interfere with the collective bargaining process and are preempted by the National Labor Relations Act (NLRA). (29 U.S.C.A. § 151 et seq.)

As a general rule, there is no reason to decide the merits of a legal question, namely, the constitutionality of section 1775, that is not presented

---

[6]"Any officer, agent, or representative of the State or of any political subdivision who wilfully violates any provision of this article, and any contractor, or subcontractor, or agent or representative thereof, doing public work who neglects to comply with any provision of section 1776 is guilty of a misdemeanor."

by this appeal. (See *Lusardi Construction Co.* v. *Aubry, supra,* 1 Cal.4th at p. 999.) To the extent Hwang argues that the entire prevailing wage scheme is preempted by federal law, we reject his contention.

The NLRA does not contain a statutory preemption provision, and state regulations in the area of labor relations will be upheld unless they conflict with the federal law, frustrate the federal scheme, or attempt to regulate a field that the Congress exclusively occupies. (*Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 747-748 [85 L.Ed.2d 728, 745, 105 S.Ct. 2380].) The Supreme Court has acknowledged that the states retain broad police powers to regulate employment within their borders by enacting child labor laws, minimum and other wage laws, and health and safety laws, among others. (*Id.* at p. 756 [85 L.Ed.2d at pp. 750-751].)

In the *Metropolitan Life* case, the Supreme Court considered whether the NLRA preempts "Minimum state labor standards [which] affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA." (471 U.S. at p. 755 [85 L.Ed.2d at p. 750].) The court concluded that "No incompatibility exists, therefore, between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements," so long as these do not undermine the NLRA's explicit goal of resolving the problem of depressed wage rates and the widening gap between wages and profits which results from the unequal bargaining power between employees and employers. (*Id.* at p. 754 [85 L.Ed.2d at pp. 749-750]; 29 U.S.C.A. § 151.)[7]

In *Fort Halifax Packing Co.* v. *Coyne* (1987) 482 U.S. 1 [96 L.Ed.2d 1, 107 S.Ct. 2211], the Supreme Court reconfirmed the rule that a state's

---

[7]Section 151 of 29 United States Code Annotated provides, in part: "The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce. [¶] . . . [¶] The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries. [¶] . . . [¶] It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."
The NLRA was enacted in 1935.

establishment of minimum substantive labor standards does not undercut collective bargaining or violate the NLRA, stressing, once again, that ". . . the NLRA is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining. 'The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment.' " (482 U.S. at p. 20 [96 L.Ed.2d at p. 17], quoting *Metropolitan Life Ins. Co.* v. *Massachusetts, supra*, 471 U.S. 724, 754 [85 L.Ed.2d at 728, 749].)

California's prevailing wage laws are compatible with, and indeed further the NLRA's aim of resolving the problem of depressed wage rates by establishing a fair and consistent minimum pay rate for all public works project employees. Nothing prevents employees from negotiating a better pay level through collective bargaining. (See § 1770.) The state prevailing wage law goes a long way toward remedying unequal bargaining power, particularly for nonunion employees such as the victims in this case. (See *General Elec. Co.* v. *New York State Dept. of Labor* (S.D.N.Y. 1988) 698 F.Supp. 1093, 1095-1101, finding New York's prevailing wage law on public works projects was not preempted by the NLRA. This holding was upheld on appeal by the Second Circuit, 891 F.2d 25, 27-28, and cert. den., 496 U.S. 912 [110 L.Ed.2d 283, 110 S.Ct. 2063].)

The federal case law relied upon by Hwang is both inapposite and unpersuasive. *Bechtel Constr., Inc.* v. *United Broth. of Carpenters* (9th Cir. 1987) 812 F.2d 1220 concerned apprenticeship wage standards in a private works contract. The case does not address the prevailing wage laws which concern us here. The federal court ruled that the apprenticeship standards, as provided for by California regulation, did not establish a legal "minimum" labor standard under *Metropolitan Life Ins. Co.* v. *Massachusetts, supra*, 471 U.S. 724, because the state regulatory scheme only covered one class of workers—apprentices—and allowed the apprenticeship wage standards to be undercut. (812 F.2d at p. 1224. Cf. *Dillingham Const. N.A., Inc.* v. *County of Sonoma* (N.D.Cal. 1991) 778 F.Supp. 1522.)

In *Associated Builders & Contractors* v. *Baca* (N.D.Cal. 1991) 769 F.Supp. 1537, the laws being examined were local resolutions and an ordinance affecting the wages on private works contracts. The district court went far beyond the *Bechtel* case, which it was attempting to follow, and concluded that the prevailing wage standard was not a "minimum" standard and therefore impermissibly interfered with the collective bargaining process. (769 F.Supp. at p. 1545.) The court also found that the localities' uneven application of their resolutions and ordinance allowed preferential treatment of particular employers, at the government's discretion, and regulated an

area already governed by collective bargaining. The federal court did not address the constitutionality of the Labor Code's prevailing wage laws as applied to public works projects.

Neither *Bechtel* nor the *Baca* case convinces us that California's prevailing wage law is preempted by the NLRA. The prevailing wage standard for public works projects is mandatory and applied consistently to "all workers employed on public works" without any discretionary determinations by the contracting public entity. (§ 1771.) These laws clearly establish a minimum substantive requirement for contracts between the government and private contractors, protect union and nonunion employees alike, and allow for collective bargaining to obtain even greater benefits than those provided by law. In short, the Labor Code's prevailing wage laws (§ 1770 et seq.) are not preempted by the NLRA.

### DISPOSITION

The judgment (order setting aside the information) is reversed, and the case is remanded to the superior court for further proceedings.

Fukuto, J., and Nott, J., concurred.

Respondents' petition for review by the Supreme Court was denied September 8, 1994.